**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-342 (PLF)** |
| **v.** | : | |
| | : | |
| **JERAMIAH CAPLINGER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeramiah Caplinger ("Caplinger") to three months' incarceration followed by 36 months' probation, as well as $500 in restitution.

**I.        Introduction**

The defendant, Jeramiah Caplinger, participated in the January 6, 2021 attack on the United States Capitol ("the Capitol")—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Caplinger pleaded guilty to one count of 40 U.S.C. § 5104(d): Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds. As explained herein, a sentence of three months incarceration is appropriate in this case because: (1) the defendant prepared for violence by bringing body armor to Washington, D.C., which he wore while inside of the U.S. Capitol; (2) the defendant scaled a wall of the U.S. Capitol to reach the Upper Terrace level of

the building; (3) the defendant penetrated the U.S. Capitol all the way to the suite of offices belonging to Speaker of the House Nancy Pelosi on the second floor and to the corridor outside of the Senate Floor on the third floor; (4) the defendant's statements on social media on and after January 6, 2021, and continuing into January 2022 reveal a lack of remorse; (5) the defendant participated in a photoshoot and gave interviews to two separate publications (MLive.com[1] and *The Detroit News*), published February 15, 2021 and March 4, 2021, demonstrating, again, a total lack of remorse; (6) in a December 17, 2021 interview with the Federal Bureau of Investigation ("FBI"), the defendant omitted information and repeatedly downplayed his actions on January 6; and (7) Caplinger has repeatedly used marijuana in violation of his terms of pretrial release—even as recently as January 14, 2022, after the Court admonished him.

Further, the Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-54-TSC, Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification—combined with the defendant's preparation for violence, his endorsement of violence, and his lack of remorse—renders a sentence of incarceration both necessary and appropriate in this case.

---

[1] MLive.com is a Michigan news website maintained and published by Advance Publications, a parent company that owns nine Michigan print and online-only news publications under its MLive Media Group brand.

II.    **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), at Paragraphs 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Jeramiah Caplinger's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Caplinger rented a vehicle and drove from Taylor, Michigan straight to Washington, D.C. to attend the "Stop the Steal" rally. Ex. A (Audio of December 17, 2021 FBI Interview) at 13:09-13:50, 22:50-23:25. Caplinger decided to go to Washington, D.C. after seeing former President Trump's Twitter post promoting the rally. *Id.* at 13:09-13:40. To prepare for possible violence, Caplinger brought body armor to Washington, D.C. *Id.* at 15:10-21:11. The body armor—which Caplinger wore inside of the U.S. Capitol—consisted of two plates, one on the frontside and one on the backside. *Id.* at 21:40-21:58.

On January 6, sometime between 8 a.m. and 9 a.m., Caplinger and his friend[2] drove to the Ellipse for former President Trump's rally. *Id.* at 28:30-29:10. Caplinger stayed at the rally for the speeches, *id.* at 34:50-35:00, and after the speeches ended, Caplinger walked with others towards the U.S. Capitol, helping carry a giant flag, *id*. at 35:10-35:30.

---

[2] The friend has not been charged with any crime(s) related to January 6. The United States has no indication that the friend entered the U.S. Capitol.

After arriving, Caplinger can be seen in an open-source video scaling a wall of the U.S. Capitol onto the Upper West Terrace as rioters around him screamed "Let's go, come on" and "USA." Ex. B (open-source video).



At approximately 2:22 p.m., as seen on CCTV, Caplinger was outside of the Senate Wing Doors.



While law enforcement officers guarded the Parliamentarian Doors, as seen below in an open-source video, the Senate Wing Doors had already been breached, and windows on either side of the doors smashed approximately nine minutes earlier, at approximately 2:13 p.m.





Caplinger entered the U.S. Capitol at approximately 2:23 p.m. through the unguarded Senate Wing Doors. Ex. C (CCTV footage) at 0:45.



At approximately 2:24-2:25 p.m., as seen below on CCTV, law enforcements officers attempted to hold back aggressive rioters as they entered the Crypt but were quickly overwhelmed.







At 2:25 p.m., Caplinger entered the Crypt, where he joined rioters in pushing past police officers to the House side of the U.S. Capitol. Ex. D at 0:13 (CCTV footage); Ex. E (CCTV footage) at 0:21.






Approximately 8 minutes later, at 2:33 p.m., Caplinger walked down the hallway of offices assigned to Speaker of the House Nancy Pelosi on the second floor of the U.S. Capitol. Ex. F.



At 2:34 p.m., Caplinger entered the Rotunda. Ex. G (CCTV Footage). Caplinger can be seen gesticulating and waving his flag as he appeared to shout. *Id*. at 0:10; 0:30.



Caplinger exited, re-entered, and re-exited the Rotunda. *Id.* at 1:32. At approximately

2:28 p.m., rioters ran back inside of the Rotunda as smoke fumes wafted into the room.[3] *Id.* at

4:15-5:00.



After Caplinger re-entered the Rotunda at about 2:40 p.m., Caplinger gestured to other

rioters to follow him out of the Rotunda. Ex. H (CCTV Footage).



---

[3] This video appears consistent with Caplinger's statements to the FBI in December 2021 when he stated that he observed a man outside of the Rotunda spraying a law enforcement officer's face with a fire extinguisher. Ex. A at 40:20-41:08; 57:20-58:00.

Shortly before 2:45 p.m., according to CCTV, Caplinger was outside the Senate Gallery. Ex. I (CCTV Footage). At 2:45 p.m., according to CCTV, Caplinger walked along the third floor East Corridor. Ex. J (CCTV Footage)





At approximately 2:47 p.m., Caplinger approached the East Rotunda Doors from the stairs connecting the third floor to the second, went back up the stairs to the third floor, came

back down, and re-entered and exited the Rotunda. Ex. K (CCTV Footage). Caplinger exited the

U.S. Capitol through the East Rotunda Doors at approximately 2:55 p.m. *Id.* at 7:25.



       As part of his guilty plea, Caplinger admitted that he knew at the time he entered the U.S.

Capitol Building that he did not have permission to do so and that he did so with the intent to

impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Social Media Posts*

       Prior to January 6, 2021 Caplinger posted on his Facebook account about the allegedly

stolen election. On November 30, 2020, Caplinger posted, "Twitter facebook, and democrats are

LIARS also Joe Biden is NOT president elect." Ex. L at 1. On December 22, 2020, Caplinger

posted, "After watching the patriots in Oregon, should we do the same soon? (Just a simple

question) because if you ask me, I think this should be seriously considered." *Id.* at 2.

       On December 29, 2020, Caplinger re-posted the following image with the comment "I

say storm the capitals [sic]." *Id*. at 3.

12



On January 6, 2021, Caplinger's sister asked, "[H]ow's rioting going lol?" Caplinger responded, "Greeaat" then "Glad I had body armor." *Id.* at 4-5.

After the attack on the Capitol, Caplinger's repeated statements on social media demonstrated his lack of remorse. The following day, January 7, 2021, after Caplinger's sister informed him that he was on the news the night before, Caplinger responded, "Nnooooo XD" then "Lmfao ik mom called me to tell me that."[4] *Id.* at 5. On January 8, 2021, Caplinger posted on Facebook, "Hope everyone who went to D.C makes it home safe and sound things are only going to escalate and get worse going forward." *Id.* at 16. That same day, Caplinger posted a

---

[4] "Lmfao" is a common abbreviation for "laugh[ing] my fucking ass off." *See* http://onlineslangdictionary.com/meaning-definition-of/lmfao (last visited on January 22, 2022); https://www.dictionary.com/browse/lmao (last visited on January 22, 2022).

picture that appeared to be of a soldier in the American Revolution with the comment, "As said

by Cersi Lannister 'I choose violence.'"[5] *Id.* at 17.



On January 26, 2021, in a private message with another individual, in referencing his

actions on January 6, Caplinger stated, "Why? No need to be sorry I did nothing wrong as for

many others" and "People were literally let in." *Id.* at 19. Caplinger further bragged, "I helped

carry that giant American flag from Trump's speech to the capitol building." *Id.*

On January 29, 2021, a reporter from MLive.com, *see* Footnote 1, contacted Caplinger on

Facebook and requested an interview and photoshoot, to which Caplinger agreed. *Id.* at 20, 43.

---

[5] Cersei Lannister is a fictional character in the HBO television series "Game of Thrones." After being confronted by a group of politically-empowered religious zealots, who warn her that that if she does not yield to them "there will be violence," Cersei Lannister responds, "I choose violence." Shortly thereafter, Cersei Lannister used a weapon of mass destruction to blow up one of the largest and most important buildings in the capital city, which at the time contained almost all of the city's preeminent politicians and religious leaders. In stating, "I choose violence," Cersei Lannister embraced—and then carried out—mass murder to achieve her political ends. In the context of Caplinger posting this just two days after January 6, Caplinger's adoption of this quote is alarming and provides insight into his mental state and intent in storming the Capitol.

On February 12, the reporter asked Caplinger, "This video seems to show you climbing a wall outside the Capitol. That's slightly different from how you described it. Can you clear this up for me too?" *Id.* at 21. Caplinger responded, "My apologies, yes I did climb a wall it looked fun." *Id.* Caplinger then sent to the reporter 12 photographs from the U.S. Capitol on January 6, including photographs from the rally as well as the exterior of the building. *Id.* at 25-42.[6]

In addition to the photoshoot and article, MLive.com also recorded portions of Caplinger's interview and uploaded the interview onto Youtube.com. *See* MLive, "What Michigan Man Saw Inside the Capitol on January 6," https://www.youtube.com/watch?v=rn63kHXdaCg (last visited on January 23, 2022). During the interview, Caplinger repeatedly described the violence and destruction he observed/heard as he "explored" the U.S. Capitol, including observing a rioter spray a law enforcement officer, hearing people kicking/smashing doors, and seeing a rioter urinating inside of the building. *Id.* at 1:00; 1:33; 2:04. Caplinger further stated that he observed, "glass, blood, urination, I don't even what to know what that brown stuff is." *Id.* at 2:40. Although Caplinger allegedly had thoughts of leaving, he did not do so. *Id.* at 2:15. In fact, Caplinger did not leave until he saw law enforcement officers begin to arrest rioters. *Id.* at 4:55.

On March 3, 2021, Caplinger posted on Facebook, "They think it's been enough time since the election, they may think 'we should be safe now.'"

In addition to Facebook, Caplinger remained an active Twitter user, under multiple Twitter handles. As with his Facebook account, Caplinger's tweets and re-tweets have consistently demonstrated his lack of remorse as to his actions on January 6. For example, in July

---

[6] After sending the photographs, Caplinger told the reporter, "I don't really take many pictures" but gave the reporter permission to publish the photographs he sent. Ex. L at 42. Caplinger's words suggest he took the photographs.

2021, in response to a video uploaded by Haley Talbot, a MSNBC reporter, of fearful members of Congress within the House of Representatives chambers as a gunshot and alarms sounded in the background,[7] Caplinger responded, "Look at all these worthless cowards."



On July 24, 2021, in response to a tweet that stated, "Trump is out here just making stuff up in hopes of snowing people into believing the election was stolen from him," Caplinger responded, in defense of former President Trump, "Only people who make things up is the FBI and media."

---

[7] The video specifically depicts Congresswoman Pramila Jayapal of Washington state.



About two weeks following Caplinger's interview with the FBI on December 17, 2021,
Caplinger tweeted:



Approximately two months after his Rule 11 hearing—in which Caplinger admitted that
he did not have permission to enter the U.S. Capitol on January 6, 2021, and that he did so with
the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress—Caplinger
re-tweeted conspiracy theories about FBI involvement with, and cover-up of, January 6:



Even on the one-year anniversary of January 6, 2021, in response to a tweet calling January 6 "#GasLightingDay,"[8] with a doctored video depicting members of Congress in headgear like that worn by Jacob Chansley, a well-publicized January 6 rioter, Caplinger responded, "Lmfao." *See* Footnote 4.

---

[8] To "gaslight" means "[t]o psychologically manipulate (someone) so that they question their memories, perception, or sanity." *The American Heritage Dictionary of the English Language* (5th ed.).



*Interview with MLive.com and <u>The Detroit News</u>*

As noted above, in February 2021, Caplinger gave an interview to MLive.com in which he compared himself to a bear repeatedly poked with a stick and being "pissed off." Ex. M (MLive.com Interview) at 2. He said that "being told the election was stolen was one poke too many." *Id.* Caplinger described driving over 500 miles to attend former President Trump's rally, before scaling a wall of the U.S. Capitol. *Id.* at 3-4. Caplinger admitted that he scaled the wall and entered the Capitol through an open doorway because "it looked fun." *Id.* at 4. He admitted that he saw that others "had actually broke[n] through" Capitol entrances "with broken glass and everything," and he claimed he "ended up walking toward there and looking at the damage and just exploring for the most part." *Id.* at 5. In discussing the lawmakers at the U.S. Capitol on January 6, Caplinger added, "If you take a job, you take on the responsibility of that job and

everything and anything that comes with it. So, to members of Congress that sit there like AOC (and say) 'I almost died.' Then why don't you quit and go do something else. If you feel that strong about it, leave." *Id*. at 7. Caplinger reiterated that he had no regret, stating, "To have a regret means to have done something wrong. To have done something wrong would mean I broke something, destroyed something or whatever. No." *Id*. at 6.

In conjunction with the MLive.com interview, the defendant participated in a photoshoot while draped in the American flag and wearing his "Trump2020" bucket hat—which he wore at the U.S. Capitol on January 6, 2021.



In March 2021, Caplinger gave an interview to *The Detroit News*. *See* Exhibit N (*The Detroit News* Interview). During the interview, Caplinger told the reporter that he didn't "feel like he had done anything wrong, that he had just wandered the halls of Congress." *Id*. at 1. While inside the U.S. Capitol, Caplinger joined a group of people "he thought was going to the Senate chambers." *Id*. at 6. Caplinger described observing rioters "kicking the doors to the House

chamber . . . broken windows, overturned furniture, blood by a broken door window . . ." *Id.* However, Caplinger did not decide to leave until he saw officers climb a stairway to arrest people. *Id.*

*Jeramiah Caplinger's FBI Interview*

On December 17, 2021, FBI agents interviewed Caplinger in anticipation of the plea agreement. Caplinger was present during the interview with his attorney. During the interview, Caplinger provided statements inconsistent with the physical evidence. In some instances, after the FBI agents showed Caplinger evidence contrary to his statements, Caplinger revised his statements. For example:

1. Caplinger stated that he did not have a Parler social media account. When confronted with evidence of his Parler account, Caplinger spoke to his attorney, and then admitted that he previously had a Parler account. Ex. A at 8:15-11:45; 20:28-20:48.

2. Caplinger stated that he did not bring body armor to Washington, D.C. Caplinger then stated that his girlfriend's family-owned body armor but that he did not bring it Washington, D.C. When confronted with his social media statements, and after consultation with his attorney, Caplinger admitted that he brought the body armor to the U.S. Capitol on January 6. *Id.* at 15:10-21:11.

3. Caplinger told FBI that he did not see anyone break any windows or glass at his entry point because he was "not paying attention to his periphals." After being challenged on the statement and consulting with his attorney, Caplinger appeared to sidestep the initial question and stated that he didn't "put [] pieces together" and "was not paying attention" to the rioting generally until he was inside of the Rotunda. *Id.* at 43:45-47:15.

In other instances, Caplinger simply omitted important information. For example, Caplinger failed to tell the FBI that, after leaving the Rotunda, he went to the third floor outside of the Senate Gallery.

Caplinger further told the FBI that he decided to scale a wall because "it seemed like a faster alternative" and the "least point of resistance" into the U.S. Capitol because the stairs were "packed" with people "rush[ing] up the stairs." Ex. A at 42:27-42:56. Caplinger stated that he

entered the Capitol through "open doors" and that he had "thought at the time that [he] had seen a Capitol police officer waving [him] in" but realized it was not an officer but an individual wearing tactical gear.[9] *Id*. at 43:00-43:35. After entering the U.S. Capitol, Caplinger admitted that he observed violence against law enforcement officers, which "surprised" him, including a man outside of the Rotunda spraying a law enforcement officer's face with a fire extinguisher. *Id*. at 40:10-41:08, 57:20-58:00. Nevertheless, Caplinger continued walking around the U.S. Capitol, taking pictures and warning other rioters about law enforcement officers. *Id.* at 57:20-59:45.

Caplinger admitted that he gave interviews to both MLive.com and *The Detroit News*. *Id*. at 1:06:55-1:07:10. Caplinger further admitted to using Twitter and having two accounts. *Id*. at 1:20:10-1:22:35.

*The Charges and Plea Agreement*

On April 1, 2021, Caplinger was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(d), 5104(e)(2)(D) and (G). On April 6, 2021, he was arrested at his home in Taylor, Michigan. On May 5, 2021, Caplinger was charged by five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(d), 5104(e)(2)(D) and (G). On November 5, 2021, Caplinger pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(d), Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds. By plea agreement, the defendant agreed to pay $500 in restitution to the Department of the Treasury.

---

[9] Although Caplinger told MLive.com that a U.S. Capitol Police ("USCP") officer let him inside of the building without opposition, *see* Exhibit M at 4, and told FBI that it was another rioter dressed in tactical gear at the Senate Wing Doors, Caplinger's entry into the U.S. Capitol is depicted in Exhibit C. There does not appear to be a USCP officer or anyone dressed like a USCP officer waving people into the Capitol.

### III.  Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(d). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the Capitol was literally occupied by hostile actors. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization

did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Caplinger's individual conduct, we must assess his conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are neither exhaustive nor dispositive, they help to place each defendant on a spectrum and aid the Court in imposing fair and just punishment. Any one of these aggravating factors alone could be sufficient to support jail or prison time if the defendant's associated conduct was bad enough.

To be clear, had Caplinger personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Caplinger from most other misdemeanor defendants.

Caplinger's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Caplinger was prepared for violence when he traveled to the U.S. Capitol on January 6, 2021. Caplinger wore body armor, which he described as two armored plates, one on his frontside and one on his backside. Caplinger's actions certainly suggest that he was prepared—or even expecting—more than a peaceful protest. Indeed, when asked by his sister "how's rioting going" on January 6, the defendant did not correct his sister's choice of words but affirmatively responded, ""Greeaat," adding, "Glad I had body armor." Two days later, the defendant posted his approval of violence, stating, "As said by Cersi Lannister 'I choose violence.'"

On January 6, by the time the defendant scaled the wall of the U.S. Capitol, rioters had aggressively attacked and pushed past law enforcement officers guarding the Northwest Stairs and scaffolding, despite officers' repeated use of pepper spray. As depicted in the photographs Caplinger uploaded soon after January 6 (and sent to people on Facebook), the Upper West Terrace had been overrun by rioters.[10]

---

[10] According to CCTV, Caplinger entered the Capitol building on the West side and exited the building on the East side. Caplinger further told FBI during his interview that after leaving the building, he sat down briefly for 5-10 minutes and then left the vicinity of the building. Ex. A at 1:00:20-1:01:00. Therefore, Caplinger likely took the photographs of the West side before entering the building.





Indeed, Caplinger's own actions that day contradict any assertion that he was there for a peaceful protest; when he saw that the stairs to the Upper West Terrace were "packed" and that

people were "rush[ing] up the stairs," the defendant decided to climb a wall because it was the "point of least resistance."

Caplinger then entered the U.S. Capitol through the Senate Wing Doors, and although no police officers blocked his path, there were clear signs of violent, forced entry. The windows adjacent to the doors were smashed, and as depicted in Exhibit C, other rioters leaped through both windows to enter the building. Although Caplinger told the FBI that he had not seen signs of violent entry when he entered the Capitol, as depicted below in an open-source video, the defendant's vantage point would have included an unobstructed view of the windows (which had already been smashed) prior to entering:



Moreover, during his interview with MLive.com, Caplinger admitted that he walked past an entrance that rioters "had actually broke[n] through with broken glass and everything," which Caplinger "ended up walking toward [] and looking at the damage and just exploring for the most part." During his interview with *The Detroit News*, the defendant admitted that he

witnessed others "kicking the doors to the House chamber . . . broken windows, overturned furniture, blood by a broken door window . . ."

Nevertheless, despite those clear signs that the rioters were by no means peaceful and that their occupation of the Capitol was unlawful, Caplinger remained inside the building, walking around, taking pictures, and, according to his later admissions, observing another rioter spray a law enforcement officer's face with a fire extinguisher. Despite his claim to the FBI that he was "surprised" at the other rioter's "uncalled for" actions, Caplinger still did not leave the building. Indeed, after passing that violent exchange, the defendant walked even deeper into the building, climbing the stairs onto the third floor of the building, outside of the Senate Chambers.

According to Caplinger's own words, he did not leave when he saw violence against officers, but only when he observed officers climb a stairway to arrest other rioters. In other words, Caplinger only left the Capitol when it served his interests, in a failed attempt to avoid suffering consequences for his unlawful actions.

After January 6, Caplinger repeatedly trumpeted his lack of remorse on Facebook, on Twitter, and to two separate news reporters. On January 26, 2021, in a private message with another individual, in referencing his actions on January 6, the defendant stated, "No need to be sorry I did nothing wrong as for many others." On February 12, 2021, the defendant referred to climbing the wall as "fun." During the interview with MLive.com, the defendant stated, "To have a regret means to have done something wrong. To have done something wrong would mean I broke something, destroyed something or whatever. No." When discussing the dangers lawmakers faced on January 6, the defendant's response to their experience of hiding, taking shelter, and being evacuated from the threat of an angry mob was, "So, to members of Congress

that sit there like AOC (and say) 'I almost died.' Then why don't you quit and go do something else[?]"

Likewise, in July 2021, on his Twitter page, the defendant referred to the lawmakers fearing for their lives on January 6 as "worthless cowards." And, in response to a Tweet about former President Trump's allegations regarding the stolen election," Caplinger tweeted, "Only people who make things up [are] the FBI and media."

During his interview with FBI in December 2021, the defendant repeatedly lied to agents. First, he falsely denied that he owned a Parler social media account. Then he falsely denied that he brought body armor with him to the U.S. Capitol. The defendant then omitted that he went to the third floor of the U.S. Capitol. Despite his statements on Facebook and to reporters about the signs of violence against property and law enforcement officers he witnessed, the defendant downplayed the violence perpetrated by the mob to FBI, telling agents that he didn't "put pieces together" about the violence until later inside of the Rotunda of the U.S. Capitol.

Following his FBI interview, Caplinger re-tweeted conspiracy theories about January 6. In response to another user referring to January 6 as "#GasLightingDayJan6" and tweeting a doctored video of members of Congress wearing fur headdresses, the defendant tweeted "Lmfao." The defendant's statements on social media and to news reporters and his lies to the FBI (which took place 11 months after January 6 and more than a month after his guilty plea) demonstrate Caplinger's failure to accept responsibility for his actions and his lack of contrition.[11]

---

[11] Caplinger also mocked the FBI on Twitter. In early December 2021, in response to another person's question as to the meaning of "FBI," Caplinger responded on Twitter, "Federal Bitches of Incompetence."

To be clear, the government recognizes that Caplinger is entitled to hold whatever political views he pleases and express them, whether on social media, in media interviews, or to law enforcement officers. The government is not advocating that the Court sentence the defendant based on his First Amendment-protected political speech, or even that the Court enhance the defendant's sentence on the basis of that political speech. The Court should, however, carefully consider the defendant's statements—on social media, in media interviews, and to law enforcement officers—as evidence of his state of mind on January 6, 2021, and thus his intent in storming the Capitol, as well as indications of the likelihood that he will similarly reoffend or conspire with, incite, or fund others to do so. No matter how often, loudly, or adamantly the defendant declares himself a "patriot" for his support of former President Trump and touts his skepticism of the results of the 2020 presidential election, the conduct Caplinger engaged in on January 6, 2021 to pursue his beliefs was not First Amendment-protected speech or First Amendment-protected protest.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

Caplinger is a stay-at-home father who has been terminated from five jobs in the past year due to his unwillingness to comply with mask and vaccine mandates.

Caplinger does not have any prior criminal convictions. The defendant has struggled with narcotics addiction and reports that he is a daily marijuana user. The defendant has had multiple pretrial release violations while on pretrial release, including testing positive for marijuana five times: on August 4, 2021; September 16, 2021; October 15, 2021; December 9, 2021; and January 14, 2022. In fact, in the nine months Caplinger has been under supervision, he has only

passed his required drug test twice. The Court has admonished the defendant, to little avail. For example, on November 8, 2021, this Court ordered the defendant to report to the U.S. Probation and Pretrial Office for the Eastern District of Michigan for a mental health evaluation, comply with all treatment recommendations, sign all release waivers, and report treatment compliance to the Court. *See* ECF 38. While Caplinger reported for his mental health evaluation as required, he has continued to ignore the Court's orders otherwise. Indeed, as listed above, Caplinger twice tested positive for marijuana *after* the Court's most recent rebuke; underscoring Caplinger's lack of contrition and respect for the rule of law, Caplinger's most recent failed drug test occurred within two weeks of his sentencing.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[12] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

---

[12] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this particular defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-cr-41, Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. Of the factors that this Court must consider, there is possibly no greater support for incarceration than the need to provide general deterrence to anyone who might consider undertaking similar dangerous and undemocratic actions in the future.

*Specific Deterrence*

Caplinger's actions, words, FBI interview, statements on social media, and behavior under supervision clearly demonstrate the need for specific deterrence. Caplinger scaled a wall on the side of the U.S. Capitol and entered the building through an unguarded door in between broken windows and shards of glass on the ground. Once inside, he walked through the Crypt, the Speaker's wing, and the Rotunda, and went to the third floor outside the Senate Gallery. Even after observing violence against police officers outside the Rotunda, he continued walking deeper and further inside the building.

After January 6, Caplinger repeatedly demonstrated his support for the insurrection on January 6 and lack of remorse for his participation in it. In private posts on Facebook and even in public interviews to reporters, the defendant repeatedly stated that he did not feel remorseful for his actions. For example, he posted a message on Facebook stating, "Hope everyone who went to D.C makes it home safe and sound[;] things are only going to escalate and get worse going forward." Caplinger said that he "cho[]se violence" and went so far as to post, "They think it's been enough time sine [*sic*] the election, they may think 'we should be safe now.'" The

defendant further celebrated his actions from January 6 by giving proud interviews to news reporters about his actions and conducting a photoshoot, brazenly wearing the same hat he wore while inside of the Capitol on January 6.

The defendant has never fully accepted that his actions on January 6 were wrong. Indeed, the first time the defendant expressed remorse for his conduct on January 6 was during his interview with the FBI in December 2021, almost a year after the riot, an interview the Caplinger only conducted because it was a condition of his plea agreement. Although he expressed regret to the FBI in that interview, it appears to have been insincere. Caplinger lied about and attempted to downplay his actions on January 6. Further, during that same month, the defendant expressed his disdain for the FBI on Twitter, referring to them as "bitches" and incompetent. On the one-year anniversary of the Capitol riot, the defendant tweeted that he was "laughing [his] fucking ass off" at another user's tweet mocking members of Congress and suggesting that the response to January 6 was "gaslighting." These posts indicate that Caplinger maintains a concerning lack of respect for the law, which is underscored by his repeated marijuana use in violation of his terms of pretrial release. In fact, even after the Court admonished the defendant for his repeated marijuana use, Caplinger has again tested positive twice for marijuana. A prison sentence is necessary to ensure that Caplinger understands the seriousness of his actions, and never again "choose[s] violence" when displeased by the results of an election or other lawful government action.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on democracy at the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement officers, to conspiracies to

corruptly interfere with Congress.[13] Each offender must be sentenced based on his or her individual circumstances, but the Court also must keep the backdrop of the January 6 riot in mind. Each offender's case exists on a spectrum that ranges from conduct meriting a probationary sentence to crimes warranting years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not be the default or even the Court's starting point.[14] Indeed, the government invites the Court to join Judge Lamberth's admonition, later echoed by Judges Hogan and Friedman, that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-97 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[13] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. *See, e.g.*, *United States v. Hatley*, 1:21-cr-98-TFH, Tr. 12/16/21 at 3 ("it's a good guideline for the Court to understand the variety of sentences that have been given [referencing the government's sentencing chart]") (statement of Judge Hogan).

[14] Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164-RCL; *United States v. Valerie Elaine Ehrke*, 1:21-cr-97-PFF; and *United States v. Donna Sue Bissey*, 1:21-cr-165-TSC. The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Caplinger has pleaded guilty to Count Five of the Information, charging him with Climbing on U.S. Capitol grounds, a violation of 40 U.S.C. § 5104(d). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly

similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider as reference points the sentences imposed on misdemeanor defendants Erik Rau (120 days of incarceration requested by the government, 45 days incarceration imposed by the Court), Virginia Spencer (split sentence of 90 days incarceration followed by 36 months of probation requested, 90 days incarceration imposed), and William Tryon (30 days of incarceration requested, 50 days incarceration imposed). *See United States v. Rau*, 1:21-cr-467-JEB; *United States v. Spencer*, 1:21-cr-147-CKK; *United States v. Tryon*, 1:21-cr-420-RBW. Caplinger's conduct falls within the high range of these defendants, and he should be sentenced accordingly.

For example, on September 29, 2021, the Honorable James E. Boasberg sentenced Rau to 45 days incarceration. Like Caplinger, Rau was prepared for violence when he traveled to Washington, D.C., and upon approaching the U.S. Capitol, Rau climbed a bicycle rack as a ladder to scale a wall. Rau entered the Capitol approximately five minutes after the breach, and although no police officers blocked his path, there were also clear signs of violent entry as he entered the building. Like Caplinger, Rau ignored the signs of violent entry and continued to move deeper into the U.S. Capitol, including the Rotunda and the rooms belonging to the Speaker of the House. In total, Rau spent approximately 40 minutes inside the Capitol. After January 6, Rau admitted to destroying evidence on his cellular phone.

On January 19, 2022, the Honorable Colleen Kollar-Kotelly sentenced Spencer to a sentence of 90 days of incarceration.[15] Outside the Capitol, Spencer and a group of others

---

[15] Judge Kollar-Kotelly originally pronounced a split sentence of 90 days of incarceration followed by 36 months of imprisonment, the same sentence requested in this case. *See* 1:21-cr-147-CKK, Doc. 63. Following the sentencing hearing, Spencer filed a "Motion to Correct Judgment under Federal Rule of Criminal Procedure 35(a) and to Stay Entry of Judgment and Commitment Order," arguing that a split sentence for a Class B misdemeanor is unlawful. *See*

engaged in a verbal confrontation with members of the Metropolitan Police Department. Some members of that group physically assaulted officers but Spencer did not. Spencer observed law enforcement officers attempt to turn back the mob using tear gas and percussion grenades but this did not deter her. Like Caplinger, Spencer entered the Capitol via a path cleared by violence. Spencer brought her 14-year-old son with her. Spencer joined two other mobs inside the Capitol, which physically overwhelmed police, though she was not at the front of those groups. Like Caplinger, Spencer proceeded to Speaker of the House Nancy Pelosi's suite of offices, where she roamed around. In total, Spencer spent approximately 33 minutes inside the Capitol. Once arrested, Spencer lied to law enforcement and claimed that she did not possess any photos or videos from her invasion of the Capitol (ultimately, the FBI found her photos). At Spencer's sentencing, Judge Kollar-Kotelly noted that Spencer did not appear to have truly accepted responsibility; Spencer had expressed regret for the social, financial, and legal consequences she suffered as a result of her conduct on January 6, 2021, but not sincere contrition for the significance of her behavior and threat it posed to our democracy. Tr. at 42:16-43:1.

On January 14, 2022, the Honorable Reggie B. Walton sentenced William Tryon to 50 days incarceration, almost double the 30 days of incarceration requested by the United States. Tryon initially attempted to gain entry to the Capitol Building on his own, coming face to face with USCP officers stationed near the doors. Tryon refused to comply with their directions and was pepper-sprayed and hit with a baton by the officers. As he recovered, he told a citizen journalist that he wanted to enter the Capitol to disrupt what Congress was doing. Tryon

---

Doc. 66. Over the government's opposition, *see* Doc. 67, the Court granted the defendant's motion and amended Spencer's sentence, eliminating the post-incarceration period of probation, *see* Doc. 70. Notwithstanding Judge Kollar-Kotelly's ruling, the United States maintains that a split sentence was lawful in Spencer's case and would be in Caplinger's, as discussed further below.

ultimately entered the Capitol through a door opened by an unidentified man, whom Tryon had just seen breaking a window and entering the Capitol through that window. Tryon only spent five to eight minutes inside the Capitol before being forced out. Once back outside, however, he tried to rally and incite the crowd toward further riotous behavior. Tryon's continual demonstrations of a lack of remorse or sincere acceptance of responsibility in the days, weeks, and months after January 6, 2021—indeed until his PSR interview—featured prominently in Judge Walton's explanation for the sentence he imposed.

Although there is no evidence that Caplinger destroyed evidence on his phone, Caplinger, like Rau and Spencer, engaged in obstructive behavior, including providing false statements to the FBI during his December interview. Further, whereas Rau apparently expressed sincere contrition and regret for his actions on January 6, Caplinger—like Spencer and Tryon—has not. Caplinger has flouted the pretrial conditions set forth by this Court, lied to the FBI, and repeatedly demonstrated both a lack of remorse for his conduct on January 6 and indifference to the effect his conduct had on others, specifically members of Congress who felt terrorized by the mob of which Caplinger was a vocal member.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and

will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—three months of incarceration followed by 36 months of probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.   *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a

sentencing court may impose a term of continuous incarceration that exceeds two weeks[16] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[17] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[16] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[17] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii.  <u>Analysis</u>

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") §

5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a
sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . .
the defendant is sentenced at the same time to a term of imprisonment for the same or a different
offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other
than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight
imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172
F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004);
*United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to
sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same
time to a term of imprisonment for the same or a different offense that is not a petty offense." 18
U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that
defendant may be sentenced to a period of continuous incarceration and a term of probation. *See
United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the
defendant, convicted of a petty offense, was sentenced to two years of probation with the first six
months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section
3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense
defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see*
Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence
on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021)
("[W]here the defendant is being sentenced for a petty offense, a trial court may properly
sentence such individual to a term of continuous imprisonment for a period of time, as well as a

44

sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again

provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 3 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.

Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 3, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period

of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Caplinger pleaded guilty to one count of 40 U.S.C. § 5104(d): Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.*

#### i. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[18]

    ii.  <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[19]

---

[18] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[19] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jeramiah Caplinger to three months' incarceration followed by 36 months' probation, as well as $500 in restitution. Such a sentence is lawful and serves to protect the community, promote respect for the law, and deter future crime by imposing restrictions on Caplinger's liberty as a consequence of his behavior, which he does not appear to regret.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:      /s/ *Lucy Sun*                              
         Lucy Sun
         Assistant United States Attorney
         Detailee – Federal Major Crimes
         United States Attorney's Office
         for the District of Columbia
         Telephone No. (617) 590-9468
         Lucy.Sun@usdoj.gov

By:      /s/ *Michael M. Gordon*             
         Michael M. Gordon
         Assistant United States Attorney
         Detailee to the
         United States Attorney's Office
         for the District of Columbia from the
         United States Attorney's Office
         for the Middle District of Florida
         Telephone No. (813) 274-6370
         Michael.Gordon3@usdoj.gov

Table 1: Cases in which the government recommended a probation sentence without home detention[1]

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Morgan-Lloyd, Anna | 1:21-CR-00164-RCL | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, 120 community service hours, $500 restitution |
| Ehrke, Valerie | 1:21-CR-00097-PLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, $500 restitution |
| Bissey, Donna | 1:21-CR-00165-TSC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 14 days incarceration, 60 hours community service, $500 restitution |
| Hiles, Jacob | 1:21-CR-00155-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |
| Wangler, Douglas | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 60 hours of community service, $500 restitution |
| Harrison, Bruce | 1:21-CR-00365-DLF | 40 U.S.C. § 5104(e)(2)(G) | 48 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 60 hours of community service, $500 restitution |

Table 2: Cases in which the government recommended a probation sentence with home detention

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|

---

[1] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

| Bustle, Jessica | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 40 hours community service, $500 restitution | 2 months of home detention, 24 months' probation, 40 hours community service, $500 restitution |
|---|---|---|---|---|
| Bustle, Joshua | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 40 hours community service, $500 restitution | 1 month home detention, 24 months' probation, 40 hours community service, $500 restitution |
| Doyle, Danielle | 1:21-CR-00324-TNM | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 probation | 2 months' probation, $3,000 fine, $500 restitution |
| Bennett, Andrew | 1:21-CR-00227-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 3 months of home detention, 24 months' probation, 80 hours community service, $500 restitution |
| Mazzocco, Matthew | 1:21-CR-00054-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 45 days incarceration, 60 hours community service[2], $500 restitution |
| Rosa, Eliel | 1:21-CR-00068-TNM | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 12 months' probation, 100 hours community service, $500 restitution |
| Gallagher, Thomas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, a fine, and $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |
| Vinson, Thomas | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 3 years' probation, 60 hours community service, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |

[2] The government believes the Court's 10/4/2021 minute entry in this case is incorrect and the sentence requires 60 *hours* of community service, not 60 *months*.

| | | | | |
|---|---|---|---|---|
| Dillon, Brittiany | 1:21-CR-00360-DLF | 40 U.S.C. § 5104(e)(2)(D) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 3 years' probation, $500 restitution |
| Sanders, Jonathan | 1:21-CR-00384-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, 60 hours community service, $500 restitution |
| Fitchett, Cindy | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Sweet, Douglas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Cordon, Sean | 1:21-CR-00269-TNM | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months' probation, $4000 fine |
| Wilkerson, John IV | 1:21-CR-00302-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, $2500 fine, 60 hours community service, $500 restitution |
| Jones, Caleb | 1:21-CR-00321-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 24 months' probation, $500 restitution, 100 hours community service |
| Brown, Terry | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, $500 restitution, 60 hours community service |
| Wrigley, Andrew | 1:21-CR-00042-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 18 months' probation, $2000 fine, $500 restitution, 60 hours community service |

| | | | | |
|---|---|---|---|---|
| Parks, Jennifer | 1:21-CR-00363-CJN | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, $500 restitution, 60 hours community service |
| Reimler, Nicholas | 1:21-CR-00239-RDM | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Miller, Brandon | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 20 days incarceration, 60 hours community service, $500 restitution |
| Miller, Stephanie | 1:21-CR-00266-TSC | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 14 days incarceration, 60 hours community service, $500 restitution |
| Hatley, Andrew | 1:21-CR-00098-TFH | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, $500 restitution |
| Pert, Rachael | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months home detention, 24 months' probation, 40 hours community service, $500 restitution | 24 months' probation, 100 hours community service, $500 restitution |
| Winn, Dana | 1:21-CR-00139-TNM | 18 U.S.C. § 1752(a)(1) | 3 months home detention, 24 months' probation, 40 hours community service, $500 restitution | 10 days incarceration (weekends), 12 months' probation, 100 hours community service, $500 restitution |
| Wickersham, Gary | 1:21-CR-00606-RCL | 40 U.S.C. § 5104(e)(2)(G) | 4 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 3 months home detention, 36 months' probation, $2000 fine, $500 restitution |
| Schwemmer, Esther | 1:21-CR-00364-DLF | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |

| Kelly, Kenneth | 1:21-CR-00331-CKK | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months home detention, 12 months' probation, 60 hours community service, $500 restitution |
| Straka, Brandon | 1:21-cr-00579-DLF | 40 U.S.C. § 5104(e)(2)(D) | 4 months home detention 3 years probation | 3 months home detention 3 years probation |

Table 3: Cases in which the government recommended a sentence of incarceration

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
| --- | --- | --- | --- | --- |
| Curzio, Michael | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | Not applicable | 6 months incarceration (time served), $500 restitution |
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 18 months incarceration | 8 months incarceration, 24 months' supervised release, $2000 restitution |
| Dresch, Karl | 1:21-CR-00071-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration (time served), $500 restitution | 6 months incarceration (time served), $500 restitution |
| Jancart, Derek | 1:21-CR-00148-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Rau, Erik | 1:21-CR-00467-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Hemenway, Edward | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Reeder, Robert | 1:21-CR-00166-TFH | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration, $500 restitution | 3 months incarceration, $500 restitution |
| Bauer, Robert | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Smocks, Troy | 1:21-CR-00198-TSC | 18 U.S.C. § 875(c) | Low end of sentencing guidelines as determined by the court, 36 months supervised release | 14 months incarceration, 36 months supervised release |
| Vinson, Lori | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |

| Griffith, Jack | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
|---|---|---|---|---|
| Torrens, Eric | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 2 weeks incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
| Gruppo, Leonard | 1:21-CR-00391-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 90 days home detention, 24 months' probation, $3,000 fine, $500 restitution |
| Ryan, Jenna | 1:21-CR-00050-CRC | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $1000 fine, $500 restitution |
| Croy, Glenn | 1:21-CR-00162-BAH | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 90 days home detention, 14 days community correctional facility, 36 months' probation, $500 restitution |
| Stotts, Jordan | 1:21-CR-00272-TJK | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 60 days home detention, 24 months' probation, $500 restitution, 60 hours community service |
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1) | 44 months incarceration, 36 months' supervised release, $2000 fine | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Camper, John | 1:21-CR-00325-CKK | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $500 restitution, 60 hours community service |
| Rukstales, Bradley | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Cordon, Kevin | 1:21-CR-00277-TNM | 18 U.S.C. § 1752(a)(1) | 30 days incarceration, 12 months supervised release, $500 restitution | 12 months' probation, 100 hours community service, $4000 fine, $500 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 51 months incarceration, 36 months supervised release, $2000 restitution | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Mish, David | 1:21-CR-00112-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Lolos, John | 1:21-CR-00243-APM | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 14 days incarceration, $500 restitution |
| Scavo, Frank | 1:21-CR-00254-RCL | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 60 days incarceration, $5000 fine, $500 restitution |

| | | | | |
|---|---|---|---|---|
| Abual-Ragheb, Rasha | 1:21-CR-00043-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 60 days home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Peterson, Russell | 1:21-CR-00309-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Simon, Mark | 1:21-CR-00067-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 35 days incarceration, $500 restitution |
| Ericson, Andrew | 1:21-CR-00506-TNM | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 20 days incarceration (consecutive weekends), 24 months' probation, $500 restitution |
| Pham, Tam Dinh | 1:21-CR-00109-TJK | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 45 days incarceration, $1000 fine, $500 restitution |
| Nelson, Brandon | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 24 months' probation, $2500 fine, $500 restitution, 50 hours community service |
| Markofski, Abram | 1:21-CR-00344-JDB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, $500 restitution | 24 months' probation, $1000 fine, $500 restitution, 50 hours community service |
| Marquez, Felipe | 1:21-CR-00136-RC | 18 U.S.C. § 1752(a)(2) | 4 months incarceration, 1 year supervised release, $500 restitution | 3 months home detention, 18 months' probation, $500 restitution |
| Meredith, Cleveland | 1:21-CR-00159-ABJ | 18 U.S.C. § 875(c) | Midrange of 37-46 months incarceration | 28 months incarceration, 36 months supervised release |
| Sorvisto, Jeremy | 1:21-CR-00320-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Mariotto, Anthony | 1:21-CR-00094-RBW | 40 U.S.C. § 5104(e)(2)(G) | 4 months incarceration, 36 months' probation, $500 restitution | 36 months' probation, 250 hours community service, $5000 fine, $500 |
| Courtright, Gracyn | 1:21-CR-00072-CRC | 18 U.S.C. § 1752(a)(1) | 6 months incarceration, 12 months' supervised release, 60 hours community service, $500 restitution | 1 month incarceration, 12 months' supervised release, 60 hours community service, $500 restitution |
| Palmer, Robert | 1:21-CR-00328-TSC | 18 U.S.C. § 111(a) and (b) | 63 months incarceration, 36 months supervised release, $2000 restitution | 63 months incarceration, 36 months supervised release, $2000 restitution, |

| | | | | |
|---|---|---|---|---|
| Thompson, Devlin | 1:21-CR-00461-RCL | 18 U.S.C. § 111(a) and (b) | 48 months incarceration, 36 months supervised release, $2000 restitution | 46 months incarceration, 36 months supervised release, $2000 restitution |
| Edwards, Gary | 1:21-CR-00366-JEB | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, 24 months' probation, $500 restitution | 12 months' probation, $2500 fine, 200 hours of community service, $500 restitution |
| Tutrow, Israel | 1:21-CR-00310-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 2 months home detention, 36 months' probation, $500 restitution |
| Ridge IV, Leonard | 1:21-CR-00406-JEB | 18 U.S.C. § 1752(a)(1) | 45 days incarceration, $500 restitution | 14 days consecutive incarceration, $1000 fine, 1 year supervised release, 100 hours community service, $500 restitution |
| Perretta, Nicholas | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Vukich, Mitchell | 1:21-CR-00539-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Spencer, Virginia | 1:21-CR-00147-CKK | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, 36 months' probation, $500 restitution | 90 days incarceration, $500 restitution |
| Kostolsky, Jackson | 1:21-CR-00197-DLF | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days home detention, 36 months' probation, $500 restitution |
| Rusyn, Michael | 1:21-CR-00303-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 60 days home detention, 24 months' probation, $2000 fine |
| Tryon, William | 1:21-CR-00420-RBW | 18 U.S.C. § 1752(a)(1) | 30 days incarceration, 12 months supervised release, $500 restitution | 50 days incarceration, 12 months supervised release, $1000 fine, $500 restitution |
| Sells, Tanner | 1:21-CR-00549-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration, 36 months' probation, 60 hours community service, $500 restitution | 90 days home detention, 24 months' probation, 50 hours community service, $1500 fine, $500 restitution |
| Walden, Jon | 1:21-CR-00548-DLF | 40 U.S.C. § 5104(e)(2)(G) | At least two weeks incarceration, 60 hours community service, $500 restitution | 30 days home detention, 36 months' probation, 60 hours community service, $500 restitution |

| Wiedrich, Jacob | 1:21-CR-00581-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, 36 months' probation, $500 restitution | 3 months home detention, 36 months' probation, 100 hours community service, $500 restitution |
| Stepakoff, Michael | 1:21-CR-00096-RC | 40 U.S.C. § 5104(e)(2)(G) | 14 days incarceration | 2 months home detention 12 months probation; $500 restitution; $742 fine |
| Scirica, Anthony | 1:21-CR-00457-CRC | 40 U.S.C. § 5104(e)(2)(G) | 15 days incarceration; 4 months' home detention | 15 days incarceration $500 restitutio; $500 fine |
| Crase, Dalton | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration 36 months probation | 15 days intermittent incarceration as a condition of 36 months probation |
| Williams, Troy | 1:21-CR-00082-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration 36 months probation | 15 days intermittent incarceration as a condition of 36 months probation |