```
1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2        - - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
3                                              Criminal Action No.
                          Plaintiff,           1:21-cr-00342-PLF-1
4                                              Monday, August 1, 2022
         vs.                                   2:02 p.m.
5
         JERAMIAH CAPLINGER,
6
                          Defendant.
7        - - - - - - - - - - - - - - - - x
         _____
8
                     TRANSCRIPT OF SENTENCING HEARING
9            HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
                     UNITED STATES DISTRICT JUDGE
10       _____
         APPEARANCES:
11       For the United States:        MICHAEL MATTHEW GORDON, ESQ.
                                       DOJ-USAO
12                                     400 North Tampa Street
                                       Suite 3200
13                                     Tampa, FL 33602
                                       (813) 274-6370
14                                     michael.gordon3@usdoj.gov

15       For the Defendant:            JAMES GEROMETTA, ESQ.
                                       FEDERAL COMMUNITY DEFENDER
16                                     613 Abbott, Suite 500
                                       Detroit, MI 48226
17                                     (313) 967-5839
                                       james_gerometta@fd.org
18
                                       JOHN M. PIERCE, ESQ.
19                                     JOHN PIERCE LAW
                                       21550 Oxnard Street
20                                     3rd Floor, PMB #172
                                       Woodland Hills, CA 91367
21                                     (213) 279-7846
                                       jpierce@johnpiercelaw.com
22
         Court Reporter:               Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                       U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                       Washington, DC  20001
25                                     (202) 354-3187
```

1                          P R O C E E D I N G S

2                  THE COURTROOM DEPUTY:  Judge, this is Criminal

3      Action 21-342, *United States vs. Jeramiah Caplinger*.

4                  For the United States I have Michael Gordon.  For

5      defendant, I have James Gerometta and John Pierce.  Our

6      probation officer today is Robert Walters.  Also joining us

7      today is Jeffrey Lowrey from the FBI, and our court reporter

8      is Lisa Moreira.

9                  All parties are present.

10                 THE COURT:  Okay.  Good afternoon, everybody.

11     We're here for sentencing, and Mr. -- oh, Mr. Pierce is

12     here.  Mr. Pierce had indicated earlier he might not be

13     here.

14                 You're on mute, Mr. Pierce.

15                 MR. PIERCE:  Yes, Your Honor.  I just -- I just

16     didn't have a chance to really get with Mr. Gerometta and

17     Mr. Caplinger in too much detail, and so I figured I'd be

18     here just to be safe.

19                 THE COURT:  Okay.  Good.  Thank you very much.

20                 MR. PIERCE:  Of course.

21                 THE COURT:  So we're here for sentencing.

22     Mr. Caplinger -- I see, okay -- Mr. Caplinger, who I see is

23     there with Mr. Gerometta, pled guilty to Count 5, I believe,

24     of the five-count information, which is a violation of Title

25     46 United States Code Section 5104(d), stepping, climbing,

1    moving, or injuring property on the Capitol grounds.  And in

2    exchange for the plea, among other things, the government is

3    going to dismiss the other four misdemeanor charges.

4            The sentencing was postponed for a while because

5    there was a legal issue that had to do with whether or not,

6    for a Class B misdemeanor, one could be sentenced to both a

7    term of imprisonment and a term of probation or whether they

8    were mutually exclusive, and we had briefing on that.  I

9    heard argument on that.  I issued an opinion some time ago

10   in which I said that the law was such and the guidelines and

11   the statutes were such that one could be sentenced to both a

12   term of imprisonment followed by a period of probation so

13   that everyone has known for some time.

14           The government had filed a lengthy sentencing

15   memorandum before I decided that issue.  They've not

16   filed -- they have not filed anything supplemental.

17           The defendant had filed a sentencing memorandum

18   before I decided that issue, and they have filed a

19   supplemental memorandum.

20           The probation office filed its sentencing

21   memorandum and recommendation some time ago, and I gather

22   it's the same, and it hasn't added anything to what they've

23   said before.

24           The only other thing that's happened recently is

25   that there were allegations or a petition from pretrial --

1    not the most recent one but an earlier one -- that said that

2    Mr. Caplinger had not been following all of his conditions,

3    one of which is no use of marijuana.  And I understand that

4    he was using it for medical reasons, which is legal in

5    certain states, including where he is, but there's still a

6    federal law, and it's still a violation.

7            So at the end of the hearing before Magistrate

8    Judge Harvey he issued a report and recommendation on July

9    25th, and in that he indicated that Mr. Caplinger was now

10   attending dual drug/mental health treatment once a month.

11   He'd been doing so since January 2022, and Magistrate Judge

12   Harvey suggested maybe doing it more than once a month would

13   make sense.

14           The government still wanted his pretrial release

15   revoked.  Judge Harvey declined to do that and suggested

16   that Mr. Caplinger's use of marijuana -- this is Docket No.

17   69 in this case -- Mr. Caplinger's use of marijuana and

18   other products, including CBD products, violated the terms

19   of his supervised release and federal law.  He was not

20   excused by the fact that he may have ingested some or all of

21   these substances in accordance with state law, citing cases.

22           But Judge Harvey said that he's been testing

23   negative for the last few months, he's been receiving dual

24   mental health and drug treatment, he's been otherwise

25   compliant, and since sentencing was coming up anyway, the

1    magistrate judge recommended that he maintain --

2    Mr. Caplinger remain out on bond with conditions until

3    today, until we have the sentencing and see where we are.

4           So that's, as I understand it, the lay of the

5    land.  I've read everything that's been filed in the case,

6    and I'm happy to proceed in any way you want to.

7           The only other thing that I will note -- and I

8    think everybody is in agreement with this -- is that because

9    it's a Class B misdemeanor, punishable at six months or

10   less, the sentencing guidelines do not apply in this case.

11   It's made clear under the law and under the guidelines

12   themselves.  And so therefore the question before me is,

13   considering all the facts and circumstances, what is a

14   reasonable sentence under the factors set forth in 18 USC

15   3553(a)?

16          So that's my little introduction.  I'm happy to

17   hear from anybody else who -- anybody who thinks I've

18   misstated anything or wants to amend or say anything about

19   what I have said.  Otherwise we can proceed in whatever

20   order you want to.

21          MR. GORDON:  Good afternoon, Your Honor; Mike

22   Gordon for the United States.

23          I have nothing to add about the history of the

24   case, though I do have a presentation that I would like to

25   make at the appropriate time in supplementation of the

1        sentencing memo that the government filed.

2                THE COURT:  Mr. Gerometta or Mr. Pierce?

3                MR. GEROMETTA:  I have nothing to add to the

4        Court's history.  I guess if -- I would appreciate if the

5        government would go first, if they have some supplemental

6        material.

7                THE COURT:  Okay.  Why don't we -- if that's all

8        right with you, Mr. Gordon, why don't you go first, and

9        then I'll hear from the defense, and obviously, if you want

10       to respond further after that, Mr. Gordon, you can.  And

11       I'll hear from anybody else the defendant wants me to hear

12       from and then go forward with sentencing, obviously, after

13       Mr. Caplinger himself.

14               MR. GORDON:  Thank you, Your Honor.  And I've

15       organized the government's information in a PowerPoint

16       presentation that I have on a second screen so Your Honor

17       may see another account where it says "Government's

18       Exhibits," and I'm going to share that screen while I talk

19       through it.

20               Your Honor, can you see that PowerPoint

21       presentation?

22               THE COURT:  I can.

23               MR. GORDON:  Excellent.

24               So to begin, as stated in the government's

25       sentencing memorandum, we're requesting a sentence of three

1    months of incarceration followed by 36 months of probation.

2    That three-month sentence is in the middle, essentially, of

3    the range that the Court may impose given that there's a

4    six-month maximum in this case.  And as I'll describe

5    further and as has been described in the sentencing

6    memorandum, this is a sentence for whom we do think a split

7    sentence is appropriate.

8         This defendant has, by his behavior, demonstrated

9    that post-incarceration supervision would be necessary,

10   would be advisable to ensure that he does not reoffend, and

11   so that the 36 months of probation should follow the period

12   of incarceration as this defendant needs that in order to

13   sort of successfully reintegrate into society and not

14   reoffend in the future.

15        So before getting to January 6th and the

16   defendant's conduct on that date, I want to address the

17   defendant's premedication, which I think really

18   differentiates this defendant from most misdemeanor

19   defendants.

20        Many misdemeanor defendants that appeared before

21   courts in this district on January 6th cases have made

22   claims that they just went to Washington, D.C., to watch a

23   rally, and that they were swept up in the moment, or they

24   didn't know what they were doing, or they were just

25   following the crowd.  That's not the case with this

1     defendant.  He is not someone who can claim that he was just

2     swept up in the moment.

3          The defendant stated on Facebook back on December

4     22, 2020, in a public post:  "After watching the patriots in

5     Oregon, should we do the same soon?  (Just a simple

6     question) because if you ask me, I think this should be

7     seriously considered."

8          So what's the defendant referring to when he says

9     "after watching the patriots in Oregon"?  So the date

10    December 22, 2020.

11         Well, the previous day, on December 21st of 2020

12    in Salem, Oregon, at the Oregon State Capitol, the Oregon

13    State House, as *New York Times* described in their headline,

14    "Armed Protesters Angry Over Virus Restrictions Try to Force

15    Their Way into the Oregon State House."

16         What happened in Salem, Oregon, that day was a

17    prelude, a dress rehearsal, a preview of what would happen

18    on January 6th.  A group of armed, mostly Trump supporters,

19    as described by their own flags and their own social media

20    posts, came to the State Capitol while the State House was

21    in session, armed, and tried to break through the doors and

22    windows of that State Capitol to forcibly make Oregon state

23    representatives rescind the mask mandates and other

24    restrictions that the government had lawfully put in place

25    to deal with the COVID-19 pandemic.

1          I've included here some images that were publicly

2     available that were photographed by photographers on the

3     ground there on December 21st of what happened at the Oregon

4     State House.

5          You can see in the first photograph on the left

6     that the police are in riot gear, just like they were on

7     January 6th, and that the protesters are outside trying to

8     break through the door.

9          You can see in the second photograph on the right

10     a rioter actually trying to use a pole to break the glass of

11     the door and enter.

12          In the next slide, you can see on the left the

13     photograph that the rioters brought with them bear spray or

14     chemical irritant spray, which they used against the police

15     officers.  And you can see in the second photograph on the

16     right that many of those rioters came armed with firearms,

17     declaration -- declaring their support for Former President

18     Donald Trump, including here a magazine marked as a MAGAzine

19     or a Make-America-Great-Again-zine.

20          This is what happened the day before.  Armed

21     protesters or armed rioters trying to forcibly interfere

22     with the lawful procedures of government.

23          One week later, the defendant posted this on

24     Facebook:  "Operation Occupy the Capitol, Taking Back Our

25     Country From Corrupt Politicians."

1     "We the people are the rightful masters of both

2     Congress and the courts, not to overthrow the Constitution

3     but to overthrow the men who pervert the Constitution."

4          Now, the defendant didn't create this graphic, but

5     when he shared it just a week after proposing maybe we

6     should do what they did in Oregon, he added his own text to

7     it that said "I say storm the Capitol."

8          So two weeks before the January 6th riot the

9     defendant proposed it and framed it as though I'm just

10    asking the question, looks like a good idea, and one week

11    before the January 6th riot the defendant emphatically

12    stated "I say storm the Capitol."  And it says in the

13    graphic "for the purpose of overthrowing the lawfully elect

14    representatives doing the people's business there."

15         And then the defendant admitted to a friend on

16    January 6th that he came to the Capitol with body armor.  In

17    other words, he came prepared for violence, expecting

18    violence.  You don't bring body armor just to watch a

19    speech.  You bring body armor if you're expecting to have to

20    fight.

21         That was why the defendant was premeditated in

22    coming to the Capitol.  He wasn't swept up.  He spent

23    multiple weeks thinking about it, encouraging it, planning

24    for it, and coming for that purpose.

25         So what did the defendant actually do on January

1    6, 2021?

2              After the speech by Donald Trump, the defendant

3    went to the Capitol where he didn't walk through doors

4    following a crowd on his own first.  No.  He scaled the

5    wall, and he said he did it because it looked like fun.  So

6    any suggestion from the defendant that, oh, he thought he

7    was just on a tour or he thought he was being welcomed in is

8    ridiculous.

9              The defendant's method of entering the Capitol was

10   to scale the wall itself, something we associate with raids

11   of medieval castles.  He's not taking the stairs or a door.

12   He's scaling the wall, and he said he did it, flippantly,

13   because it looked like fun.

14             The next few slides take Your Honor through a

15   timeline of the defendant's actions.

16             So 2:15 p.m. is when rioters first successfully

17   breach the Capitol via the Senate Wing doors smashing the

18   glass and the windows on either side of the Senate Wing

19   door.  From there rioters streamed in.

20             Seven minutes later the defendant was on the west

21   plaza just outside of the Senate Wing door.  If you look on

22   that photograph on the left, the Senate Wing door is the

23   door in the middle arch.  To the left of that is the Senate

24   parliamentarian door.  The photograph on the right shows the

25   Senate parliamentarian door, which the defendant would have

1    seen as he approached the Senate Wing door.

2           At that time, at 2:22, the Senate Wing door, the

3    one in the middle of the archway, had already been breached,

4    and rioters were streaming in.  So the Capitol Police in

5    riot gear were guarding the Senate parliamentarian door

6    trying to block that being another access point.

7           At the same time this is what the defendant says

8    he saw in an interview he gave on February 15th to a

9    publication called M Live in Michigan.  He stated that "I

10   came across people taking pictures and videos, live chats.

11   I was walking toward one of the other entrances.  They had

12   the one they had actually broke through with broken glass

13   and everything.  And I ended up walking toward there and

14   looking at the damage and just exploring for the most part."

15          So the defendant there is saying that he was

16   walking toward the Senate parliamentarian door, saw that one

17   guarded, but then realized that the Senate Wing door had

18   already been broken through by rioters.  He admits he saw

19   broken glass and everything.  He saw damage, and he

20   knowingly entered.  So, again, any suggestion that he

21   thought he was invited in is patently absurd.  He knew what

22   he was doing.

23          The defendant, as you can see here, walked through

24   the Senate Wing door at 2:23, and over the course of the

25   next half hour here's where he went within the Capitol.

 1        He first went to the Crypt.  Your Honor, 2:24 to

 2   2:25, this is what was happening in the Crypt.  The Crypt is

 3   just about a hundred feet down the hall from where the

 4   defendant entered.

 5        At 2:24, two minutes after the defendant entered,

 6   the Capitol Police had kept the rioters at bay.  They had

 7   formed a wall.  But within a minute of that time rioters

 8   broke through and overwhelmed that group of Capitol Police.

 9        The defendant was right there at 2:25.  He was

10   part of that group that overwhelmed or was within seconds --

11   within a minute of the group that overwhelmed Capitol Police

12   within the Crypt.  From there he walked through the Capitol.

13        Here at 2:33 you can see the defendant is walking

14   down the hallway within Speaker of the House Nancy Pelosi's

15   suite of offices.  At that time Speaker Pelosi's staff was

16   terrified, hiding in one of those rooms underneath a table.

17   Speaker Pelosi had been evacuated, but her staff feared for

18   their lives and was hiding trying not to make a sound so

19   that rioters, like Mr. Caplinger, would not discover where

20   they were.

21        At the same time as Mr. Caplinger was roaming

22   Speaker Pelosi's suite of offices is the time when other

23   rioters were screaming things like "Where is Nancy?  We're

24   going to get Nancy.  Hang Nancy."  Et cetera.

25        From there, the defendant proceeded to the Rotunda

 1   where he spent the approximately next seven minutes walking

 2   in and out.  During his time in the Rotunda, he saw someone

 3   spraying law enforcement officers with a fire extinguisher

 4   and other, you know, conflict between Capitol Police and

 5   rioters.

 6          At 2:45 the defendant went upstairs towards the

 7   Senate gallery.  He was on the third floor of the Capitol

 8   near the Senate walking through the hallways there.  He did

 9   not manage to enter the Senate however.

10          At approximately 2:55, the defendant ascended

11   those stairs and exited the Capitol shortly thereafter

12   walking through the doors outside the Rotunda, and that's --

13   the Rotunda is what you can see through that brown doorway

14   in the center of this photograph.

15          The defendant has exhibited no remorse or did not

16   exhibit any remorse between January 6th and his plea

17   colloquy, when suddenly he started stating that he regretted

18   what he had done.  Your Honor, I do not believe the

19   defendant's remorse is sincere based on what he did and said

20   in the year plus after January 6th when he didn't think Your

21   Honor or anybody else, like the government, was listening or

22   watching.  What he has said for Your Honor appears to be

23   more like a performance.

24          So let's look at those statements.

25          Two days after the riot at the Capitol the

1    defendant posted this on Facebook:  "As said by Cersi

2    Lannister, 'I choose violence.'"

3            Now, as the government explained in its sentencing

4    memorandum, that's a very specific cultural reference,

5    but -- Your Honor may or may not be a watcher of the *Game of*

6    *Thrones* show, but it refers to the use of a weapon of mass

7    destruction to blow up a building containing all of the

8    principal members of the government.  It's mass murder for

9    political ends.  It's a shocking moment when it happens in

10   the show, and it's even more shocking for this defendant to

11   have embraced that as what he appears to think is a morally

12   just cause of action to deal with political events he does

13   not agree with.

14           He didn't come out of January 6th thinking, you

15   know, that was wrong; that went too far.  He came out of it

16   thinking it didn't go far enough.  He was someone who viewed

17   that as a dress rehearsal, and that's evidenced by his

18   further comments since that date.

19           On January 26, 2021, about three weeks later, he

20   says, "I have no need to be sorry.  I did nothing wrong as

21   for many others.  People were literally let in."

22           This is the way he's framed it in his mind.

23   People were let in after he scaled the wall, entered a door

24   where the glass had been broken on either side, saw police

25   in riot gear guarding the door, and saw law enforcement

1    officers trying to repel rioters with pepper spray and other

2    means.

3            A few weeks after that, on February 16th, the

4    defendant had given an interview to this publication M Live.

5    And in it he's quoted as saying "I didn't break nothing.  I

6    didn't destroy nothing.  I hurt no one.  I came there, I

7    made my voice heard.  When I seen bad things start happening

8    I left... to have a regret means to have done something

9    wrong.  To have done something wrong would mean I broke

10   something, destroyed something or whatever.  No."

11           That's the defendant's assessment.  He is only

12   guilty of doing something wrong if he committed some sort of

13   property damage.  That's it.  Trying to violently stop the

14   peaceful transfer of power, trying to violently intimidate

15   representatives into doing what he wants, he doesn't see

16   that as wrong.  Like he said, he chooses violence.

17           And he has no sympathy whatsoever for the members

18   of the House of Representatives and the Senate who feared

19   for their lives that day, who cowered in offices, who were

20   fearfully under tables, who were crouched in the Senate and

21   the House galleries wearing gas masks.

22           The defendant says, "If you take a job, you take

23   on the responsibility of that job and everything and

24   anything that comes with it.  So, to members of Congress

25   that sit there like AOC" -- Alexandria Ocasio-Cortez -- "and

1    say 'I almost died.'  Then why don't you quit and go do

2    something else.  If you feel that strongly about it, leave."

3            That statement by the defendant indicates that he

4    believes fearing that you might die from mob violence is

5    just part of the gig when you run for public office.  He

6    thinks that's part of the job.  That's part of the job

7    description or job responsibility that when you become a

8    member of the House of Representatives or the United States

9    Senate, that you might die from mob violence, and you have

10   to take that risk.

11           Politicians aren't soldiers.  They aren't police

12   officers.  They aren't firefighters.  Risk of death is not

13   part of the job description, and it never should be.  Not in

14   a democratic republic, not in the United States of America,

15   not in this country.  But that is not the defendant's view

16   of his own actions, and it is part of what makes the

17   sentence the United States requests appropriate.  It is part

18   of why specific and general deterrence is extremely

19   necessary in this case.

20           The defendant goes on.

21           On March 3, 2021, he posted on Facebook "They

22   think it's been enough time since the election, they may

23   think 'We should be safe now.'"

24           By inference, the "they" in that sentence is the

25   elected representatives of the United States of America,

1    they think we should be safe now.  But in the defendant's

2    mind they are not safe.  They are not safe from people like

3    him who are unhappy about the results of the 2020 election

4    and believe that violence is necessary and justified to try

5    to change that result.

6             The defendant gave another interview on March 4th,

7    the next day, 2021.  This one to *The Detroit News*.  He says

8    he viewed his experience with a sense of wonder.  He talked

9    about the opulence of the Capitol, the marble, the statues,

10   the paintings, especially the one in the Rotunda roof.

11   According to the reporter, he made his hour-long excursion

12   sound like a visit to the museum, albeit one where art was

13   stolen, tear gas deployed, and five people connected to the

14   events have died.

15            The defendant displays complete obliviousness to

16   what happened that day and no remorse.  In fact, he's proud

17   of it.  He views it as useful to himself in the future

18   because in that same interview this is what the defendant

19   said.

20            When he first returned from Washington, he didn't

21   publicly discuss his foray into the Capitol.  Now, in

22   talking with *The Detroit News*, he's hoping notoriety about

23   the incident will help draw attention to his quest for

24   office, whichever office it turns out to be.

25            "He said any type of publicity, even bad, could

1    help a candidacy.  As proof, he pointed at Trump's victory

2    in 2016."

3           The defendant is proud of what he did on January

4    6th, and he's hoping to take advantage of it, to use the

5    criminal notoriety to gain office himself.  This isn't

6    remorse.  This is opportunism on the back of a riot that

7    caused politicians to literally fear for their lives.

8           And further displaying the contempt he has for

9    those elected representatives who were terrified of the

10   violence he and other rioters might inflict, on July 6,

11   2021, seven months after the riot at the Capitol, the

12   defendant posted, "Look at all these worthless cowards."

13   And the people he's referring to are elected representatives

14   hiding in the gallery of the House of Representatives

15   dawning gas masks because of the rioters outside that had

16   trapped them in that room.  He sees them as cowards.

17          So what does he think they should do?  Come out

18   and face or fight him and his fellow rioters?  They were

19   cowards not to?

20          The defendant signed a plea agreement which

21   required that he have an interview with the FBI.  He didn't

22   come forward with it.  He came in only as a provision of his

23   plea agreement, and he didn't exhibit any remorse then

24   either.  He repeatedly lied during the interview.

25          He claimed to not have a Parler account.  He did.

1            He claimed he didn't bring body armor on January
2      6th.  He did.
3            He claimed he didn't see broken windows or glass.
4      He did.
5            Every time he made those statements and was
6      confronted with proof to the contrary, he huddled with his
7      attorney, came back to the table and amended his statement.
8      He also -- when describing his path, he conveniently omitted
9      the fact that he traveled to the third floor outside the
10     Senate gallery.
11           And finally, on January 6, 2022, when another
12     person on Twitter posted, "Prepare...gaslighting day January
13     6 is ramping up," and doctored a photograph to show members
14     of Congress wearing headdresses of horns like January 6th
15     defendant Jacob Chansley.  The defendant wrote "LMFAO," a
16     well-known acronym in Internet speak that basically means
17     laughing my effing ass off.
18           No remorse whatsoever.  He's still mocking the
19     accountability for January 6th.
20           Your Honor, when we look at the factors the Court
21     must consider to determine an appropriate sentence, we've
22     already gone through the nature of this offense in detail,
23     but just to zoom out a bit, the defendant was part of a mob,
24     and while he's only accountable for what he did that day, it
25     is necessary, as other judges have noted, to understand that

1    a mob is strong because of its numbers.  No single drop of

2    water in a rushing rapid is responsible for the overwhelming

3    force in a tidal wave.  The defendant was part of that tidal

4    wave, and he bears responsibility for his role in it.  He

5    encouraged violence before January 6th and afterward.  He

6    physically occupied the Capitol, and this has happened only

7    one other time in the nation's history.  He, by his own

8    statements and actions, sought to stop democracy in its

9    tracks.  He supported further riots, he exhibited no

10   remorse, and he lied to the FBI afterwards.  The nature of

11   the offense supports a stiff punishment.

12          In addition, there is great concern that others --

13   I would say first the defendant may do something similar in

14   the future based on his conduct afterward and his lack of

15   remorse, but there's also -- the Court should also be

16   concerned about the issue of general deterrence.  Given the

17   events that have happened in this country since January 6th,

18   there is a very real risk that something like that could

19   happen again.  It is often said that an unsuccessful

20   terrorist attack is merely a dress rehearsal for the next

21   one, and to discourage this defendant and others from

22   attempting anything like this ever again, the Court should

23   impose a stiff sentence against this defendant to encourage

24   that.

25          So, Your Honor, for all those reasons, a sentence

1    of three months of incarceration, potentially the middle of

2    the range available to the Court, is appropriate here, and

3    this defendant needs to be supervised afterwards not only

4    because of the risk that he might reoffend, but also because

5    it is only due to his being on supervision that the

6    defendant appears to have finally gotten his addiction to

7    marijuana under control.  He had many, many positive tests.

8    I mean, he had several positive tests post the conditions of

9    release that required that he remain negative, and then he

10   finally, over the last few months, has begun testing

11   negative and has a steady job.

12           Mr. Caplinger is at an inflection point in his

13   life, and the combination of an incarceratory sentence and

14   post-incarceration supervision is necessary to ensure that

15   he changes his ways and stays that way.

16           Thank you, Your Honor.

17           THE COURT:  Thank you.

18           So let's turn to the defense.

19           MR. GEROMETTA:  Thank you, Your Honor.

20           I agree with one thing that the government said.

21   I think that Mr. Caplinger is at an inflection point in his

22   life, but I don't -- for that reason, I don't think the

23   90-day sentence, the request, is appropriate.  What I want

24   to do is zoom out a little bit and look at the difference

25   between what Mr. Caplinger says and what Mr. Caplinger does.

 1          There's no doubt that his language on social media

 2     was over the top.  It was inflammatory, and it was violent.

 3          And he went to January 6th.  He went to the rally,

 4     and he went to the Capitol, but he was not in, as the

 5     government's presentation shows, the first wave or second

 6     wave or third wave of people entering the Capitol.  He went

 7     in the back or the middle of the crowd.

 8          There are no pictures of Mr. Caplinger breaking

 9     things because he didn't break anything.  There's no

10     indication that he stole anything because he didn't steal

11     anything.  The government said he didn't make it into the

12     Senate Chamber.  There's no evidence he tried to get into

13     the Senate Chamber.

14          By the time he got to the Senate, people had

15     already entered the Senate.  He was behind the individual

16     that they referred to as the QAnon shaman.  That person

17     had gotten into the chamber, and Mr. Caplinger -- you know,

18     Mr. Caplinger didn't go into any chambers.  He didn't go

19     into any of the offices.  He didn't engage with any of the

20     police officers.

21          There are -- I know this Court has handled other

22     cases.  You know, there's video of the Crypt where the Crypt

23     is pushed past, and you can see the people in the first

24     three or four rows that are engaging with the officers.

25     Mr. Caplinger is not in there engaging with them.  He is

1    simply either -- wandering through the Capitol.  It's not

2    right, and it's offensive, and that's why he's here taking

3    responsibility for it.

4        I think really the most important thing is that

5    he's not at the same place he was 18 months ago or a year

6    ago or even six months ago when he made some of those posts

7    on social media, on Twitter and Facebook.  He's here -- you

8    know, I think about where the country was at this time, and

9    I think about the way that the COVID lockdowns, the

10   quarantines, had isolated people, and then I think about,

11   you know, that they're isolated somewhat socially because

12   they're restricted in who they can interact with in the real

13   world, and then people are turning to social media.  And

14   social media, because of the way you see the things you

15   react to, is just reinforcing what you believe, and it's

16   putting people further and further into these silos.

17       And Mr. Caplinger is in this really silo, this,

18   you know, echo chamber reinforcing what he believes.  And,

19   you know, it doesn't just reinforce his beliefs because he's

20   still -- he's still a populist, a conservative populist, but

21   it just reinforces what you believe.  But it amps up the

22   intensity of it, and there's this feeling that whoever is

23   not in your silo is the enemy because you don't have any

24   interaction with those people, and that's what causes him to

25   post these things, these over-the-top things.

1          But when he actually interacts with other people,

2     when he's actually at the Capitol, he doesn't do these

3     things.  He doesn't engage in any violence.

4          And since that time, he's gone back to work.  And

5     I think that's the most important thing here because, as

6     Michigan started to open back up, as he was able to get a

7     job, as he was able to start working -- and he works in a

8     factory in one of the suburbs in Michigan, and there is no

9     more diverse workplace than a factory in Michigan.  You've

10    got people like Mr. Caplinger, who are, you know, these

11    conservative populists.  You've got sort of traditional UAW

12    Democrats.  You've got a host of minorities from, you know,

13    Black workers, who probably support the Black Lives Matter

14    movement, to recent immigrants, Latinx people from Southwest

15    Detroit.  You've got recent immigrants from the Middle East,

16    from Dearborn and Hamtramck.

17         And Mr. Caplinger works with all those people, and

18    he gets along with all those people, and I think that's

19    important because he is out in the community now, and he's

20    seeing these people who a year ago, when he was in this

21    silo, were the enemy.  And now he knows, because he's out

22    with them again, that they're not the enemy.

23         You know, I'm a career public defender.  It

24    shouldn't be a shock that Mr. Caplinger and I don't have the

25    same political points here.  We're on the opposite ends of

1      the extreme.  But, you know, Mr. Caplinger and I can sit,

2      and we can talk about all the things that make us Americans,

3      that make us Michiganders.  He talks about his family.  He

4      talks about gardening.  We talk about the terrible roads

5      that we have here in the state of Michigan.

6              And those are the same conversations that he has

7      at work with this wide, diverse group of people.  And

8      they're not political conversations, but they're important

9      conversations because now these people aren't the enemy.

10     They're his neighbors, his co-workers, his acquaintances,

11     and probably even his friends.

12              So the government says he needs to reintegrate

13     into society.  I think he's well on his way to reintegrating

14     with society because he is out there working with those

15     people, because he's out there making friends with those

16     people, because he's out there dealing with them every day,

17     and they're not the enemy anymore.  They're not the enemy

18     the way they were when he was locked down and on social

19     media and just hearing these things -- you know, like I

20     said, the echo chamber and people for their own purposes

21     there are amping up the confrontation between people on

22     different sides of the political spectrum.

23              I think his reintegration is on its way, and

24     that's why we're asking for a sentence of either house

25     arrest or a short sentence of incarceration, seven days or

1    less, so he can keep his job where he's doing a good job

2    where he's working, where he's in the community, and I think

3    that's what's going to stop him from reoffending.

4           This kind of offense is being part of the

5    community.  I think that's what he needs, and I think that's

6    honestly what we need as a country, is that dialogue; not

7    even political dialogue, like I said, but that

8    communication.  He needs to be part of a broader community,

9    and he is now.  And that, I think, is the most important

10   thing, and that's where he's at in his life, and I ask the

11   Court to let him continue that.

12          Thank you.

13          THE COURT:  Thank you.

14          May I ask Mr. Walters from probation, do you have

15   anything you'd like to add, Mr. Walters, or say this

16   afternoon?

17          THE PROBATION OFFICER:  No, Your Honor.  I'm here

18   to answer any questions you may have, but I have nothing to

19   add.

20          THE COURT:  Mr. Gordon, anything you want to say

21   in response to what counsel has said just now?

22          MR. GORDON:  Your Honor, I recognize that the

23   defendant has made progress in having a job, and that is

24   valuable for him.  But it does not change his actions on

25   January 6th, and to give him essentially a seven-day

1    sentence is tantamount to giving him almost a pass for what

2    he did before, during, and after.  That is not a similar

3    sentence to what similarly situated defendants have received

4    from you and other judges in January 6th cases.

5         The defendant may need that for himself, but we,

6    as a society, need accountability for the rioters who

7    sparked January 6th, who led January 6th, who participated

8    in January 6th, and who have encouraged future riots like

9    January 6th.  I think the defense's request is far below

10   that kind of accountability.

11        THE COURT:  All right.  So let me, again, ask

12   Mr. Gerometta or Mr. Pierce whether they want to say

13   anything further.

14        If not, I'll hear from anybody else that you want

15   me to hear from and, of course, from Mr. Caplinger himself.

16        MR. GEROMETTA:  Your Honor, just that that seven-

17   day sentence would be part of also a probationary or be

18   followed by a probationary sentence so it would not be the

19   only imposition on Mr. Caplinger.

20        That's all I have to add, Your Honor, and we don't

21   have anyone else to speak other than Mr. Caplinger.

22        THE COURT:  Say that again.

23        MR. GEROMETTA:  We don't have anyone else to speak

24   other than Mr. Caplinger.

25        THE COURT:  All right.  Well, I will say that

1    attached to your supplemental memo, just so the record is

2    clear, there is a letter from Samantha Marcott, M-A-R-C-O-

3    T-T, who is Mr. Caplinger's girlfriend and with whom he

4    lives.  As I understand it from what's been filed, they have

5    I think a two-year-old together, and she has an 11- or 12-

6    year-old from a prior relationship, and the four of them

7    live together.

8              There's also a letter from or an email from

9    Charles Carree, C-A-R-R-E-E, who I guess is his supervisor

10   or his boss, and he says that Mr. Caplinger works under him,

11   and he's a good worker, works hard, works well with others

12   and thinks he has a bright future and that he's now on the

13   right path.

14             So even though you say nobody wants to speak

15   today, I just want the record to be clear that you have

16   submitted these two emails or letters, which I have read and

17   am obviously considering.

18             Is there anything else any of the lawyers want to

19   say before I turn to Mr. Caplinger?

20             MR. GORDON:  No.  Thank you, Your Honor.

21             MR. GEROMETTA:  No.  Thank you.

22             MR. PIERCE:  No.  Thank you, Your Honor.

23             THE COURT:  Thank you, all.

24             All right.  Mr. Caplinger, what would you like to

25   say this afternoon?

 1          THE DEFENDANT:  Your Honor, I would like to first

 2     say and apologize to you, to the country, and to the Court

 3     about my actions on January 6th leading us to be here today.

 4     I am sorry for all that has occurred then and forward and,

 5     for me, the most important thing is not being taken away

 6     from my family.  My daughter is very young, and I don't want

 7     to be an absent father in my life.  Please don't separate me

 8     from my family.

 9          That would be all I would have to say, Your Honor.

10     Thank you.

11          THE COURT:  Anybody else have anything to say?

12          (Pause)

13          THE COURT:  Well, look, as I said at the outset, I

14     have carefully read everything in the case, sentencing

15     papers, the plea agreement, the history of the case, the --

16     some of the still photographs that were shown today were

17     also in videos that were sent to the Court and to defense

18     counsel, the Government's Exhibits B, C -- B through J are

19     footage that I saw the videos of before seeing the still

20     photos of them today.

21          Exhibit A, which was also submitted, which I've

22     also looked at, is an audio of the December 17, 2021, FBI

23     interview with Mr. Caplinger, the give-and-take between him

24     and the FBI.  And I viewed that as well as read the summary

25     of it, so I've looked at everything.

1           I will say that all of the videos that were --

2      that I saw and many of the still photos that I saw, while

3      always, you know, a picture is worth a thousand words, it's

4      fair to say that those were consistent with the statement of

5      facts that Mr. Caplinger agreed to at the time of his plea,

6      specifically Paragraphs 8 through 16 of the Statement of

7      Facts, Docket 37.  So those weren't new, although they were

8      moving pictures, videos, rather than just a summary.

9           So it falls on me to sentence, and it's always

10     difficult to do, and it's a balance of the things that --

11     and then we all agree that the guidelines don't apply in

12     this case, so it's within my discretion as to what the

13     appropriate sentence is up to the statutory maximum of six

14     months.

15          One second.

16          I think a fair summary is of that maximum six

17     months the government recommends three months and three

18     years of probation.  The defense recommends probation or at

19     most seven days incarceration.  And probation recommends no

20     incarceration and a two-year period of probation.

21          So I've considered all of that, and I've

22     considered the -- carefully considered the factors, history

23     and characteristics of the defendant, background, nature and

24     circumstances of the offense, the need to promote respect

25     for the law, deterrence, rehabilitation, balancing the needs

 1    of someone to move forward with his or her life against the

 2    conduct on the day in question.  Mr. Caplinger does not have

 3    a prior record, and this is the first conviction, and it's a

 4    misdemeanor.

 5            So I think that the government has laid out the

 6    3553 factors and has given its take on what -- how those

 7    factors play out.

 8            You know, on the positive side, Mr. Caplinger has

 9    a family to take care of.  He now has a job.  He's got

10    support from his partner, Ms. Marcott, and from his

11    employer.  He's got two young children, one very young, and

12    the financial situation for the family is not strong so his

13    income is important.

14            All of that having been said, I have to also look

15    at context in which -- what the offense was and the context

16    in which it took place.

17            He did not personally destroy any property.  He

18    did not assault anyone.  He did not assault any police

19    officers.

20            He pleaded guilty to stepping, climbing on

21    property, specifically parts of the United States Capitol

22    grounds, and the interior of the Capitol.  He was both

23    outside and inside.  And the question is, you know, in all

24    of these social media and Tweets, the attitude he had prior

25    to going to Washington, as a lot of people did, and what

1    happened thereafter.

2          So he travels to the District from another state,

3    from Michigan, as a lot of people did, for the rally that

4    the president urged people to attend, but he also clearly

5    was prepared for violence.  He brought and wore body armor.

6    He brought it with him, wore it inside the Capitol.  He was

7    prepared for violence presumably because he saw a lot of

8    things on social media in advance.  And most damaging, I

9    suppose, about his attitude is the -- what he watched on

10   social media about what occurred in the Oregon State Capitol

11   and his question "Should we do the same thing?" in the

12   middle of December, and then at the end of the month, just a

13   few days before coming to Washington, he posts on social

14   media, "I say storm the Capitol."  Not just come to a

15   protest, but storm the Capitol.

16         When he gets here, he didn't break into the

17   Capitol.  The doors were already breached.  He did, however,

18   scale a wall outside.  He entered the Capitol.  He joined

19   the mob.  He saw what was going on.  He joined the mob that

20   was pushing past police.  He did not assault any police

21   officer.

22         He went to the suite of offices of Speaker Pelosi.

23   He undoubtedly saw people rushing for safety.  He couldn't

24   have known what we later learned about Speaker Pelosi's

25   staff, scared and hiding in the office.

1          He went to the Rotunda more than once.  He went

2     in, went out.  And he did not remove himself from the events

3     as they were going on.

4          After January 6th what does he do?  Two days later

5     he posts the quote from the character in *Game of Thrones* in

6     quoting "I choose violence."  So two days after he thought

7     that was still something that he was still opting for.  He

8     saw it happening.  He saw it happen in the Capitol.  He may

9     have seen reports of it on the news in the days following.

10    He may or may not have known how many police officers were

11    injured during the insurrection at the Capitol, but he said

12    "I choose violence."  He also said, "I'm glad I had my body

13    armor."

14         Later in the month of January he said -- felt he

15    had done nothing wrong.

16         In interviews with the media five, six weeks

17    later, the first in February, middle of February, to I think

18    it was called M Live, he said he scaled the wall.  It looked

19    like fun.  He said he had no regrets.  He had done nothing

20    wrong.  He acknowledged in that interview or the other one

21    that he saw the damage, he saw the broken glass, but didn't

22    break anything himself.

23         At some point in another interview in March, again

24    he said he didn't feel like he did anything wrong, and in

25    March of -- later in March, maybe a day or two later,

1    talking to *The Detroit News*, he suggested that his conduct

2    on January 6th might help him run for political office.

3          At some point -- and I can't recall now from the

4    written filings or from the oral presentation or both during

5    that time frame when he was talking to the media, and it was

6    maybe one of the media interviews or maybe it was on social

7    media -- he was talking about representative Alexandria

8    Ocasio-Cortez and basically said, you know, if you're afraid

9    of your life by being a congressperson, you should quit,

10   suggesting -- and the government said this, and I think, you

11   know, the idea that a public servant should view it as part

12   of their job to have to fear for their life is just not in

13   the job description, whether you're a liberal or a

14   conservative or a moderate serving in Congress or whether

15   you're a conservative justice on the Supreme Court, like my

16   friend Justice Kavanaugh.  It's not part of what you sign up

17   for.  Or whether you're my colleagues on this court who

18   faced -- who needed security at various times over the last

19   couple of years and in earlier cases unrelated to anything

20   political or anything relating to January 6th.  It's not

21   part of the job description.

22         He pled guilty on November 5th, and so, you know,

23   one can -- one is drawing a continuum of Mr. Caplinger's

24   views from before January 6th to January 6th to a few days

25   after January 6th to a month or two or five or six.

1            You know, I understand some of the argument that

2       the defense is making, which is to say a lot of people came

3       to Washington.  And I've taken pleas from some and sentenced

4       some, and my colleagues have, too.  There are, what, 350 or

5       380 pleas and misdemeanor cases?  And some of them came for

6       a rally only.  Some of them came for a protest only.  But

7       some of them came prepared for violence and participated in

8       the mob storming the Capitol, running through the hallways,

9       reveling in what was going on, seeing very clearly what was

10      going on.

11           I think Mr. Caplinger fits in that group even

12      though he didn't destroy property and he did not assault

13      anyone.  And his statements a few days later and then a

14      couple of months later along that continuum suggest his

15      views had not changed, and he had not expressed remorse.

16           Then we get to his plea and what he said at his

17      plea hearing.  It took place on November 5, 2021, and he sat

18      for an interview with the FBI on December 17, 2021.  You

19      know, that was required by the plea agreement.  I'm sure he

20      may not have wanted to do that, but he understood at the

21      time of the plea that he was going to have to do that.

22           But what did he do during that FBI interview?  He

23      provided statements that were inconsistent with the physical

24      evidence.  He may not have known that they had -- that the

25      FBI agents had all that evidence or all those videos, but he

1     lied to them.

2              He said he didn't have a Parler or a social media

3     account.  When confronted with evidence that he did, he said

4     well, he previously had had such an account.

5              He said he did not bring body armor to Washington,

6     D.C., and the video showed him wearing it, and there were a

7     lot of Tweets in which he told people he did.

8              He said that his family owned body armor but he

9     didn't bring it to Washington, but when confronted with his

10    social media statements, then he admitted that he had

11    brought the body armor to the Capitol.

12             He told the FBI during the interview that he did

13    not see anyone break any windows or glass near the entry

14    point because he was not paying attention.  After being

15    challenged on the statement, he then said:  Well, I wasn't

16    paying attention to the riot generally until I was inside.

17             He said something about his peripheral vision.

18    The video or the photographs we saw today show that it

19    wasn't very far from where he already entered and where the

20    doors had been breached to that Parliamentarian Door that

21    was shown in the photograph.

22             He omitted important information.  He didn't tell

23    the FBI that after leaving the Rotunda he went to the third

24    floor outside the Senate gallery.  He said he scaled the

25    wall outside because it seemed like a faster alternative and

1    because the stairs were packed with people.

2             He admitted that he observed violence once he was

3    inside.  He said that surprised him, but he continued

4    walking around the Capitol taking pictures, warning other

5    rioters or waving other rioters on, and he -- you know, he

6    omitted information, he misstated information, and -- until

7    he was confronted with it, and this was after his plea in

8    which he had expressed remorse.  And, you know, if this were

9    a guidelines case, the government might well be arguing for

10   a 3C1.1 enhancement for obstruction of justice and wondering

11   whether they should have agreed to a downward adjustment for

12   acceptance of responsibility.

13            So, you know, all of that being said, I think that

14   Mr. Gordon made some good points on this; that, you know,

15   this was a mob.  This was an attempt to overthrow the -- to

16   interfere with the lawful functioning of one of the three

17   co-equal branches of government.  This mob physically

18   occupied the Capitol, and its purpose was to upend

19   democracy, to upend the rule of law.

20            And you could see, if you were in that mob, even

21   if you were not yourself hitting a police officer, striking

22   a police officer, tasing, macing, using bear spray, throwing

23   fire extinguishers, hitting people with flagpoles, you could

24   see people doing it all around you.  And you continued to go

25   near the Senate gallery, to the Speaker's or near the

1    Speaker's suite of offices.  And even after seeing all that

2    showing little -- showing no remorse, no acknowledgement of

3    wrongdoing, no second thoughts within the weeks and months

4    immediately after the events in question.

5            But then -- you know, I haven't reread the plea

6    transcript or my notes on the plea, but it took place on

7    November 5, 2021.  Five, six weeks later, on December 17,

8    2021, he's lying to the FBI about what he did, what he saw,

9    what happened.  And does that show obstruction of justice?

10   It's arguable.

11           Does it show an acceptance of responsibility?

12   Truly remorseful acceptance of responsibility?  I don't

13   think so.

14           And so I think a couple of things in general, and

15   then I'll go ahead and sentence.

16           I've said this before.  Other judges have said

17   this before.  Even in these six-month misdemeanor cases,

18   probation is not the default sentence.  It just isn't.  In

19   some cases it's appropriate.  In some cases it just isn't.

20   And among the many reasons are lying to the FBI in this case

21   and not showing remorse, but -- and the need to punish.

22           But I think that the most specific reasons include

23   two types of deterrence that judges think about and are

24   included in the sentencing factors.  Specific deterrence and

25   general deterrence.  And in view of Mr. Caplinger's

1     misstatements to the FBI and the number of Tweets and social

2     media posts and other things well after the events in

3     question that don't show remorse, I think he needs to be

4     deterred from doing something like this again.  And I also

5     think that a message needs to be sent, which we call general

6     deterrence, to other people.

7           Some people dispute whether general deterrence

8     serves a function, but it has always seemed to me that in

9     some sorts of cases it does.  Frankly I'm not sure it does

10     with mid-level drug dealers or even someone who shoots

11     someone on the streets, but I've always thought it does with

12     respect to political corruption, extortion, bribery,

13     embezzlement, people who had been law-abiding citizens.

14           It's sometimes important to tell other people

15     similarly situated this is not okay.  You can't do this sort

16     of thing.  And in view of what happened on January 6th

17     preceded by Oregon, preceded by Michigan and Governor

18     Whitmer, the state in which Mr. Caplinger lives, although

19     that has not been discussed in any of the filings so I'm not

20     relying on that.  And the fact that everybody -- I won't say

21     everybody, but the fact that what happened on January 6th

22     was truly a threat to our democracy and to the rule of law

23     and a violent attempt to prevent Congress of the United

24     States from doing its job, I think that a period of time in

25     prison or in jail is appropriate in Mr. Caplinger's case.

1          And so I'm going to sentence him to a period of

2     incarceration for 35 days, which is five weeks, followed by

3     a period of probation for 24 months or two years on Count 5,

4     to which he's pled guilty.  He will be permitted to

5     voluntarily surrender when he's notified by probation

6     directly and through his counsel of where he should report

7     or to begin serving his sentence.

8          And before we leave I can ask Mr. Walters about

9     how long he thinks that notice will be in coming and what

10     kind of facility and all of that given the fact that it's a

11     misdemeanor and the sentence is 35 days and not longer.

12          In addition to the sentence of incarceration

13     followed by two years of probation you're ordered to pay a

14     special assessment of $10, which is required by law, and

15     there will also be restitution in the amount of $500 to the

16     Architect of the Capitol, which was agreed at the time of

17     the plea.

18          While on probation, you shall abide by the

19     following mandatory conditions of supervision as well as the

20     standard conditions, which are imposed to establish the

21     basic expectations for your conduct while on supervision.

22          The mandatory conditions include you must not

23     commit another federal, state, or local crime.  You must not

24     unlawfully possess a controlled substance.  You must refrain

25     from use of a controlled substance.  You must submit to one

1    drug test -- and I'll say more about that in a minute --

2    within 15 days of placement on supervision and at least two

3    periodic tests thereafter.  You must make restitution in the

4    amount of $500.

5              I'm also going to require, because of what we know

6    about Mr. Caplinger's use of marijuana, albeit sometimes for

7    medical reasons, and in view of what Judge Harvey recently

8    said, I'm also going to order that while on probation you

9    participate in an inpatient and/or outpatient substance

10   abuse treatment program and follow the rules and regulations

11   of that program.  The probation officer will supervise your

12   participation in the program, including provider location,

13   et cetera.

14             And also in view of what Judge Harvey said, you

15   must participate in a mental health counseling and treatment

16   program and follow the rules and regulations of that

17   program.  The probation officers, in consultation with

18   appropriate treatment providers, will supervise your

19   participation in such a program.

20             I'm also going to order that you complete 60 hours

21   of community service over two years of probation.  The

22   probation office will supervise your participation in the

23   program by approving the program.  You have to provide

24   written verification of completed hours to the probation

25   office.

1          You must participate in an educational services

2    program and follow the rules and regulations of that

3    program.  Such programs may include high school equivalency

4    programs, GED, other classes designed to improve your

5    proficiency in reading, writing, mathematics, computer use

6    or whatever.

7          Until you've paid your financial commitments, you

8    must provide the probation officer access to any request for

9    financial information and authorize the release of any

10   financial information and that information that we share

11   with the U.S. Attorney's Office.

12         Restitution payments should be made to the Clerk

13   of the Court.  That's a $10 special assessment and $500

14   restitution.  You must -- in theory it's payable

15   immediately, but I understand that's not going to be

16   feasible, so once you begin probation, you must pay

17   restitution at a rate of no less than $25 a month payable to

18   the Clerk of the Court as I said, yes, for ultimate payment

19   to the Architect of the Capitol.  You should let the Clerk

20   of the Court know if you change your address until your

21   financial obligations are met.

22         The probation office may release the presentence

23   investigation report to all appropriate agencies, including

24   the probation office in the district of residence and any

25   treatment providers.

1          You have the right to appeal this sentence.  If

2   you want to appeal this sentence, you have to do so within

3   14 days.  If you don't file a notice of appeal within 14

4   days, you will lose your right to appeal.  Your lawyers will

5   file a notice of appeal in a timely fashion if you ask them

6   to do so.  And you also have the right, in a limited way, to

7   challenge the conviction or plea or sentence if new or

8   currently unavailable information comes to light or you

9   claim ineffective assistance of counsel or there's

10  exculpatory information and maybe some other limited things.

11          Mr. Pierce and Mr. Gerometta can advise you.  For

12  any reason they cannot continue to represent you going

13  forward, I'll appoint someone to do so.

14          Before I ask anything else, let me ask Mr. Walters

15  if there's anything I've forgotten or anything else I need

16  to say with respect to the sentence I've imposed.

17          THE PROBATION OFFICER:  Yes, sir, Your Honor.  For

18  clarity purposes, are you maintaining jurisdiction, or did

19  you want to transfer jurisdiction?

20          THE COURT:  I assume your office recommends

21  transferring jurisdiction to the Eastern District of

22  Michigan?

23          THE PROBATION OFFICER:  Yes, sir, but, of course,

24  if you want to maintain it, that's your prerogative.  He'll

25  still be supervised in Michigan, but any issues would come

1     back to you, if you reserve jurisdiction.

2                THE COURT:  In some other case I had there was a

3     provision that I get some updated report 30 days after

4     release from custody.  Do you know the language of that?

5     And then we transfer jurisdiction?

6                THE PROBATION OFFICER:  Yes, sir, we can do that.

7     I can make a notation that we do a progress report after 30

8     days, and then you can assess then if you want to transfer

9     jurisdiction.

10               THE COURT:  Okay.  Let's do that.

11               So I'll likely transfer jurisdiction, but we'll

12    get a progress report 30 days after release from

13    incarceration, and, assuming there are no issues that

14    anybody identifies, then I can transfer it to the Eastern

15    District of Michigan.

16               THE PROBATION OFFICER:  And I know you, of course,

17    went over the mandatory condition of drug testing, the

18    one -- the immediate one and then the two additional.

19    Probation typically requests that -- with especially

20    substance abuse treatment that the Court impose a substance

21    abuse testing condition.  That kind of keeps there from

22    being any issue with, well, you've done your three for the

23    year.  That way we can test him as needed.

24               THE COURT:  Okay.  Why don't we do that.  I will

25    suggest that you -- can you redraft the sentencing format

1   that I had incorporating everything I've said today?  You

2   may have to consult with my court reporter and courtroom

3   deputy.

4           THE PROBATION OFFICER:  So substance abuse testing

5   was the first condition in the recommendation.

6           THE COURT:  Okay.  Maybe you don't have to redraft

7   it.

8           So basically what you're saying is that the idea

9   of every -- at least two periodic drug tests -- rather than,

10   say, at least two periodic drug tests, say drug test during

11   the period of substance abuse treatment and counseling.

12          THE PROBATION OFFICER:  What we try to avoid with

13   the two periodic drug tests is somebody saying, "Well, I've

14   had my two for this year, and now I'm not going to have to

15   do any" --

16          THE COURT:  What's the language?  Because I'm

17   reading from what you proposed.

18          THE PROBATION OFFICER:  You must submit to

19   substance abuse testing to determine if you have used a

20   prohibited substance.  You must not attempt to obstruct or

21   tamper with the testing methods.

22          THE COURT:  That's in lieu of the other provision?

23          THE PROBATION OFFICER:  No, the other one -- the

24   two tests is the mandatory.  This would be a special

25   condition.

 1            THE COURT:  Oh, okay, so that's an additional

 2    special condition.

 3            THE PROBATION OFFICER:  Yes, sir.

 4            THE COURT:  Okay.  Fine.  And I think that

 5    Ms. Johnson and you and the court reporter, Lisa, can talk

 6    to each other.

 7            THE PROBATION OFFICER:  Of course, yes, sir.

 8            THE COURT:  Now, in your experience, Mr. Walters,

 9    in a case like this and some of these misdemeanor cases, how

10    long before there is, say, notice of where to report and

11    what kind of facility is the usual?  Is it a Bureau of

12    Prisons facility, or is it more likely a jail facility close

13    to Mr. Caplinger's place of residence?

14            THE PROBATION OFFICER:  So that was going to be my

15    next question.

16            Again, I think I know what your intent was, but

17    for clarity, it's 35 days and then 24 months probation.  The

18    35 days is not a condition of probation, correct?

19            THE COURT:  No, the 35 days -- this is a split

20    sentence.  I have written a long opinion --

21            THE PROBATION OFFICER:  Yes, sir.

22            THE COURT:  -- which your office has that says we

23    can do that.

24            THE PROBATION OFFICER:  I just wanted to make

25    sure, yes, sir.

1          THE COURT:  And this is 35 days of imprisonment

2     followed by probation.

3          THE PROBATION OFFICER:  So what we have seen, of

4     course -- quick on how the BOP works.  There's different

5     designation units depending on the part of the country.

6     We've typically seen, if the Marshals have space at the

7     local jail or the local facility like how they have

8     contracts here with many local facilities, they can usually

9     just report to the Marshals and then report to a local

10    facility where there's space.

11         I would assume Your Honor is going to recommend

12    that he be placed at a facility closest to his home as

13    possible, and with 35 days usually it may just be the county

14    detention center that's close to him where the Marshals have

15    a contract, where the BOP has a contract.

16         THE COURT:  But regardless, he will get notice,

17    and his lawyers will get notice.

18         THE PROBATION OFFICER:  Yes, sir.  We will be on

19    top of that.  We will provide him notice.  He'll remain on

20    his pretrial conditions until that time.  So he can continue

21    doing whatever he's been doing with pretrial, and we will

22    get notice and advise him of reporting as soon as probation

23    has it.

24         THE COURT:  So, Mr. Gerometta, since you're in the

25    federal public defender's service in the Eastern District of

1    Michigan, do you have any more information to enlighten us

2    on places of incarceration and how things work?

3          MR. GEROMETTA:  Your Honor, I'm assuming -- in

4    other short sentencings people have gone to a local jail

5    facility, so I assume that's what's going to happen here.

6          THE COURT:  That's what I was -- so but I assume

7    you would like me to include a recommendation that he be

8    incarcerated as close to home as possible?

9          MR. GEROMETTA:  We would.  Thank you.

10          THE COURT:  Is there anything else that anybody

11    wants to say either about conditions of release or anything

12    I failed to mention or anything else you need to put on the

13    record?

14          MR. GORDON:  Not from the United States, Your

15    Honor.  Thank you.

16          THE PROBATION OFFICER:  No, Your Honor.

17          THE COURT:  All right.  So is everybody

18    comfortable?  Are all counsel comfortable that they've

19    placed on the record any objections previously in your

20    written and oral presentations?  If not, pursuant to the

21    D.C. Circuit's opinion in *United States vs. Hunter*, 809 F.

22    3d 677, please note any additional objections for the record

23    now.

24          MR. GEROMETTA:  Your Honor, the defense continues

25    to object to the split sentence, but we've raised that in

1    writing, so thank you.

2              THE COURT:  Yes.  And if you decide to appeal,

3    that's a good issue for appeal.  I'm sure it's being raised

4    on other appeals as well.

5              Anything else from anybody?

6              MR. GORDON:  No.  Thank you, Your Honor.

7              THE COURT:  Okay, everybody.  Thank you very much.

8              Mr. Caplinger, I wish you good luck, and I hope we

9    don't see you in this court or any other court ever again.

10             THE DEFENDANT:  Thank you.

11                  (Whereupon the hearing was

12                   concluded at 3:23 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8         **NOTE:**  This hearing was held remotely by Zoom or some

9     other virtual platform and is subject to the technological

10    limitations of court reporting remotely.

11               Dated this 6th day of September, 2022.

12

13

                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                            Official Court Reporter
                              United States Courthouse
15                            Room 6718
                              333 Constitution Avenue, NW
16                            Washington, DC 20001

17

18

19

20

21

22

23

24

25