# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-342 (PLF)** |
| v. | : | |
| | : | |
| JERAMIAH CAPLINGER, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S RESENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this resentencing memorandum. This Court originally sentenced Jeramiah Caplinger ("Caplinger") to a mix of imprisonment and probation as appropriate under the 18 U.S.C. § 3553(a) sentencing factors, otherwise known as a 'split sentence'. Because that sentence has been determined to be invalid, the D.C. Circuit vacated the sentence and remanded to this Court for resentencing so that the Court can impose a new lawful sentence.

On January 6, 2021, while members of Congress gathered in the United States Capitol to certify the results of the 2020 presidential election, Caplinger wore body armor and joined a large mob of rioters attempting to stop the certification of the presidential election and the peaceful transition of power. Caplinger scaled a wall of the U.S. Capitol to reach the Upper Terrace level of the building before he entered the U.S. Capitol. Caplinger proceeded inside the building until he reached the suite of offices belonging to Speaker of the House Nancy Pelosi on the second floor and to the corridor outside of the Senate Floor on the third floor. In the months after the Capitol Siege, Caplinger made statements on social media that demonstrated a lack of remorse,

participated in a photoshoot and gave interviews to two separate publications,[1] and failed to be candid in interviews with the FBI regarding his actions on January 6. Additionally, Caplinger repeatedly used marijuana in violation of his terms of pretrial release, leading the Court to admonish him.

For this conduct, Caplinger pleaded guilty to one count of 40 U.S.C. § 5104(d): Climbing on U.S. Capitol Grounds. The Court sentenced Defendant to a "split sentence" – a term of imprisonment and a term of probation – under Title 18 U.S.C. § 3561(a)(3): Caplinger was sentenced to 35 days of incarceration followed by 2 years of probation, $500 in restitution, and a $10 special assessment. *See* August 1, 2022 Minute Order. He served his 35-day prison term, which ended on March 27, 2023.

The Government recommends the Court consider sentencing Caplinger to a term of probation that will, including any credit for prior probation and incarceration, comport with the Court's original intention of Caplinger serving two years of probation.

## I.    Factual Background

For a full description, the government incorporates by reference the Statement of Offense and the government's sentencing memorandum, *see,* ECF Nos. 37 and 46. On January 5, 2021, Caplinger rented a vehicle and drove from Taylor, Michigan straight to Washington, D.C. to attend the "Stop the Steal" rally. Ex. A[2] (Audio of December 17, 2021 FBI Interview) at 13:09-13:50, 22:50-23:25. Caplinger decided to go to Washington, D.C. after seeing former President Trump's

---

[1] MLive.com (February 15, 2021) and *The Detroit News* (March 4, 2021). MLive.com is a Michigan news website maintained and published by Advance Publications, a parent company that owns nine Michigan print and online-only news publications under its MLive Media Group brand.

[2] The government refers to, and incorporates herein, the exhibits to its original sentencing memorandum.

Twitter post promoting the rally. *Id.* at 13:09-13:40. He brought and wore body armor to Washington, D.C. and the Capitol building itself.

On January 6, Caplinger and his associate drove to the Ellipse for former President Trump's rally. Caplinger walked with others towards the U.S. Capitol, helping carry a giant flag. After arriving, Caplinger can be seen in an open-source video scaling a wall of the U.S. Capitol onto the Upper West Terrace as rioters around him screamed "Let's go, come on" and "USA." Ex. B (open-source video).



At approximately 2:22 p.m., as seen on CCTV, Caplinger was outside of the Senate Wing Doors. The Senate Wing Doors had been breached approximately nine minutes earlier at 2:13 p.m. Caplinger entered the U.S. Capitol at approximately 2:23 p.m. through the Senate Wing Doors. Ex. C (CCTV footage) at 0:45.

As part of his guilty plea, Caplinger admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so and that he did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.



At approximately 2:24-2:25 p.m., Caplinger entered the Crypt, where he joined rioters in pushing past police officers to the House side of the U.S. Capitol. Ex. D at 0:13 (CCTV footage); Ex. E (CCTV footage) at 0:21. Approximately 8 minutes later, at 2:33 p.m., Caplinger walked down the hallway of offices assigned to Speaker of the House Nancy Pelosi on the second floor of the U.S. Capitol. Ex. F.

At 2:34 p.m., Caplinger entered the Rotunda. Ex. G (CCTV Footage). Caplinger exited, re-entered, and re-exited the Rotunda. *Id.* at 1:32. At approximately 2:28 p.m., rioters ran back inside of the Rotunda as smoke fumes wafted into the room.[3] *Id.* at 4:15-5:00. After Caplinger re-entered the Rotunda at about 2:40 p.m.,

---

[3] This video appears consistent with Caplinger's statements to the FBI in December 2021 that he observed a man outside of the Rotunda spraying a law enforcement officer's face with a fire extinguisher. Ex. A at 40:20-41:08; 57:20-58:00.



Shortly before 2:45 p.m., according to CCTV, Caplinger was outside the Senate Gallery. Ex. I (CCTV Footage). At 2:45 p.m., according to CCTV, Caplinger walked along the third floor East Corridor. Ex. J (CCTV Footage).

At approximately 2:47 p.m., Caplinger approached the East Rotunda Doors from the stairs connecting the third floor to the second, went back up the stairs to the third floor, came back down, and re-entered and exited the Rotunda. Ex. K (CCTV Footage). Caplinger exited the U.S. Capitol through the East Rotunda Doors at approximately 2:55 p.m. *Id.* at 7:25.



*Social Media Posts*

For a full description of Caplinger's social media posts prior to his original sentencing, *see* ECF No. 46. Prior to January 6, 2021, Caplinger posted on his Facebook account about the allegedly stolen election. On December 29, 2020, Caplinger re-posted a screenshot of an "Operation Occupy the Capitol" graphic with the comment "I say storm the capitals [sic]." Exhibit L at 3.

On January 6, 2021, Caplinger's sister asked, "[H]ow's rioting going lol?" Caplinger responded, "Greeaat" then "Glad I had body armor." *Id.* at 4-5.

After the attack on the Capitol, Caplinger's repeated statements on social media demonstrated a lack of remorse. Furthermore, on January 26, 2021, in a private message with another individual, in referencing his actions on January 6, Caplinger stated, "Why? No need to be sorry I did nothing wrong as for many others" and "People were literally let in." *Id.* at 19. Caplinger further bragged, "I helped carry that giant American flag from Trump's speech to the capitol building." *Id.*

Caplinger's tweets and re-tweets have consistently demonstrated his lack of remorse as to his actions on January 6. For example, in July 2021, in response to a video uploaded by Haley Talbot, a MSNBC reporter, of fearful members of Congress within the House of Representatives chambers as a gunshot and alarms sounded in the background,[4] Caplinger responded, "Look at all these worthless cowards."



Approximately two months after his Rule 11 hearing—in which Caplinger admitted that he did not have permission to enter the U.S. Capitol on January 6, 2021, and that he did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress—Caplinger re-tweeted conspiracy theories about FBI involvement with, and cover-up of, January 6:

---

[4] The video specifically depicts Congresswoman Pramila Jayapal of Washington state.



Even on the one-year anniversary of January 6, 2021, in response to a tweet calling January 6 "#GasLightingDay,"[5] with a doctored video depicting members of Congress in headgear like that worn by Jacob Chansley, a well-publicized January 6 rioter, Caplinger responded, "Lmfao."

*Interview with MLive.com and* <u>*The Detroit News*</u>

In February 2021, Caplinger gave an interview to MLive.com in which he compared himself to a bear repeatedly poked with a stick and being "pissed off." Ex. M (MLive.com Interview) at 2. He said that "being told the election was stolen was one poke too many." *Id.*

---

[5] To "gaslight" means "[t]o psychologically manipulate (someone) so that they question their memories, perception, or sanity." *The American Heritage Dictionary of the English Language* (5th ed.).

Caplinger described driving over 500 miles to attend former President Trump's rally, before scaling a wall of the U.S. Capitol. *Id.* at 3-4. Caplinger admitted that he scaled the wall and entered the Capitol through an open doorway because "it looked fun." *Id.* at 4. Caplinger reiterated that he had no regret, stating, "To have a regret means to have done something wrong. To have done something wrong would mean I broke something, destroyed something or whatever. No." *Id*. at 6.

In conjunction with the MLive.com interview, the defendant participated in a photoshoot while draped in the American flag and wearing his "Trump2020" bucket hat—which he wore at the U.S. Capitol on January 6, 2021.



In March 2021, Caplinger gave an interview to *The Detroit News*. *See* Exhibit N (*The Detroit News* Interview). During the interview, Caplinger stated that he didn't "feel like he had done anything wrong, that he had just wandered the halls of Congress." *Id.* at 1. While inside the U.S. Capitol, Caplinger joined a group of people "he thought was going to the Senate chambers." *Id*. at 6.

## II.  **Original Procedural Background**

*The Charges and Plea Agreement*

On April 1, 2021, Caplinger was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(d), 5104(e)(2)(D) and (G). On April 6, 2021, he was arrested at his home in Taylor, Michigan. On May 5, 2021, Caplinger was charged by five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(d), 5104(e)(2)(D) and (G). On November 5, 2021, Caplinger pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(d), Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds. By plea agreement, Caplinger agreed to pay $500 in restitution to the Department of the Treasury.

As agreed upon in the plea agreement, on December 17, 2021, FBI agents interviewed Caplinger. Caplinger was present during the interview with his attorney. During the interview, Caplinger provided statements inconsistent with the physical evidence. In some instances, after the FBI agents showed Caplinger evidence contrary to his statements, Caplinger revised his statements. For example:

1. Caplinger stated that he did not have a Parler social media account. When confronted with evidence of his Parler account, Caplinger spoke to his attorney, and then admitted that he previously had a Parler account. Ex. A at 8:15-11:45; 20:28-20:48.

2. Caplinger stated that he did not bring body armor to Washington, D.C. Caplinger then stated that his girlfriend's family-owned body armor but that he did not bring it to Washington, D.C. When confronted with his social media statements, and after consultation with his attorney, Caplinger admitted that he brought the body armor to the U.S. Capitol on January 6. *Id.* at 15:10-21:11.

3. Caplinger told FBI that he did not see anyone break any windows or glass at his entry point because he was "not paying attention to his periph[er]als." After being challenged on the statement and consulting with his attorney, Caplinger appeared to sidestep the initial question and stated that he didn't "put [] pieces together" and "was not paying attention" to the rioting generally until he was inside of the Rotunda. *Id.* at 43:45-47:15.

10

In other instances, Caplinger simply omitted important information. For example, Caplinger failed to tell the FBI that, after leaving the Rotunda, he went to the third floor outside of the Senate Gallery.

Caplinger further told the FBI that he decided to scale a wall because "it seemed like a faster alternative" and the "least point of resistance" into the U.S. Capitol because the stairs were "packed" with people "rush[ing] up the stairs." Ex. A at 42:27-42:56. Caplinger stated that he entered the Capitol through "open doors" and that he had "thought at the time that [he] had seen a Capitol police officer waving [him] in" but realized it was not an officer but an individual wearing tactical gear.[6] *Id.* at 43:00-43:35. After entering the U.S. Capitol, Caplinger admitted that he observed violence against law enforcement officers, which "surprised" him, including a man outside of the Rotunda spraying a law enforcement officer's face with a fire extinguisher. *Id.* at 40:10-41:08, 57:20-58:00. Nevertheless, Caplinger continued walking around the U.S. Capitol, taking pictures, and warning other rioters about law enforcement officers. *Id.* at 57:20-59:45,

On August 1, 2022, after considering the facts above, the Court sentenced Caplinger to 35 days' imprisonment followed by 24 months' probation. The statutory maximum punishment under 40 U.S.C. § 5104(d) was six months of imprisonment and a fine of up to $5,000, meaning that Caplinger received a sentence below the statutory maximum. On August 16, 2022, Caplinger filed a notice of appeal, "intending to raise the 'split sentence' issue," and moved for bond pending appeal pursuant to 18 U.S.C. § 3143(b)(1). *See* Motion for Bond Pending Appeal (ECF No. 78).

---

[6] Although Caplinger told MLive.com that a U.S. Capitol Police ("USCP") officer let him inside of the building without opposition, *see* Exhibit M at 4, and told the FBI that it was another rioter dressed in tactical gear at the Senate Wing Doors, Caplinger's entry into the U.S. Capitol is depicted in Exhibit C. There does not appear to be a USCP officer or anyone dressed like a USCP officer waving people into the Capitol.

The government did not oppose the motion. *See* Government's Non-Opposition to Defendant's Motion for Bond While He Appeals His Sentence (ECF No. 79) at 1.

On January 10, 2023, the Court received a status report from the Pretrial Services Agency for the District of Columbia indicating that Caplinger violated the conditions of his supervised release by testing positive for marijuana. (*See,* ECF No. 83, Memorandum and Order). The Court gave Caplinger a judicial directive to comply with the terms of release that he not use or possess a narcotic drug or controlled substance. The Court further ordered that any additional violations of his release would lead the Court to revoke Caplinger's release on bond pending appeal.

*Service of Original Sentence*

On February 2, 2023, Caplinger moved unopposed to enter an order cancelling his appellate bond, stating that he felt it was in his best interest to serve his 35 days of imprisonment in the winter. *See* Defendant's Unopposed Motion to Cancel Appellate Bond (ECF No. 84). The court granted the motion.

Caplinger self-surrendered to FCI Miami on February 20, 2023, and served his 35-day prison term, which ended on March 27, 2023. He began serving probation on the day of his release, and that service continued until the D.C. Circuit vacated the original sentence and ordered resentencing.

**III.    Appeal and Little Decision**

As stated above, on August 16, 2022, Caplinger appealed the lawfulness of the "split sentence" originally imposed.

On August 18, 2023, the D.C. Circuit held in *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023), that probation and imprisonment are alternative sentences that cannot generally be imposed for a petty offense. Considering this ruling, the government requested a remand of

12

Caplinger's appeal to the district court for resentencing, and Caplinger asked the D.C. Circuit to vacate his probationary term.

On February 21, 2024, the D.C. Circuit vacated Caplinger's sentence in its entirety and remanded the case to the district court for resentencing. *See* Order of U.S. Court of Appeals for the District of Columbia as to Jeremiah Caplinger (ECF No. 90), *citing United States v. Little*, 78 F.4th 453, 461 (D.C. Cir. 2023). This Court scheduled the resentencing for April 16, 2024.[7]

### IV.     Resentencing and Other Options.

There is no dispute that Caplinger's split sentence of incarceration and probation is unlawful under the D.C. Circuit's decision in *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023). And, as in *Little*, the D.C. Circuit vacated the unlawful sentence in its entirety and remanded for resentencing here. *Id.* at 461 ("So we vacate Little's sentence and remand to the district court for resentencing."); *see,* ECF No. 89, Order as to Jeremiah Caplinger directing parties to meet and confer and file joint status report on or before March 6, 2024.

This Court is thus conducting this resentencing in order impose a lawful sentence. *See United States v. Little*, No. 21-CR-315-RCL, ECF 69 at 5-7 (denying Little's motion to remove or terminate probation where the D.C. Circuit had vacated the sentence and remanded the case for resentencing, noting that "[t]he mandate rule requires the Court to obey that directive by resentencing Little").

---

[7] The D.C. Circuit's mandate has not yet issued. *See* Order of U.S. Court of Appeals for the District of Columbia as to Jeremiah Caplinger (ECF No. 90). The government expects the mandate to be issued on April 15, 2024—just one day before the currently scheduled date for the resentencing hearing. *See* D.C. Cir. R. 41(a) (withholding issuance of mandate until 7 days after expiration of time for filing petition for rehearing or petition for rehearing en banc); D.C. Cir. R. 35(a) (petition for rehearing or petition for rehearing en banc must be filed within 45 days).

At the same time, Caplinger should receive credit for time already served. *See Little*, No. 21-CR-315-RCL, ECF 69 at 14 ("the Court may impose an additional punishment on Little so long as it appropriately credits the time Little served in prison and on probation against the punishment"); *United States v. Martin*, 363 F.3d 25, 37-38 (1st Cir. 2004) (unlawful term of probation must be credited against any subsequent sentence of incarceration); *United States v. Lominac*, 144 F.3d 308, 318 (4th Cir. 1998) (unlawful term of supervised release must be credited against any subsequent sentence of incarceration).[8]

Accordingly, the government submits that upon resentencing, the court has three options: a term of probation or incarceration equal to the amount of time already served; a term of probation longer than the time already served, with credit for time already spent on probation and "extra" credit for time spent in custody; or a term of incarceration longer than the time already served, with credit for time already spent in custody and some kind of credit for time already spent on probation.[9]

---

[8] Because probation is a less restrictive penalty than incarceration, crediting time served on probation against a future term of incarceration, or crediting time incarcerated against a future term of probation, should not be "a day-to-day offset." *Martin*, 363 F.3d at 39. While the precise crediting ratio in this case is for the district court to consider, the specific ratio should derive from a "fact-based inquiry" that looks to "the specific conditions of [defendant's] probation and the effect of [any crediting] on the underlying purposes of the [sentencing statute] as set out in 18 U.S.C. 3553(a)." *Id.*

[9] The resentencing in *Little* is instructive. Little was originally sentenced to a split sentence of 60 days' imprisonment and 36 months' probation. At the time of resentencing, after remand from the D.C. Circuit, Little had completed his term of imprisonment and approximately 18 months of probation. At the resentencing, the court imposed a prison sentence of 150 days. *See Little*, No. 21-CR-315-RCL, Minute Entry for Resentencing (Jan. 25, 2024); *see also Little*, 21-CR-315-RCL, ECF 73 (Notes for Resentencing). The court credited the 60 days of incarceration that Little previously served and gave an additional 30 days of credit against the new sentence for the 18 months of probation already served, noting that Little "has spent essentially no time in compliance with the terms and conditions of his probation." *Little*, 21-CR-315-RCL, ECF 73 at 2 (Notes for Resentencing). Thus, after accounting for 90 days of credit for time previously served, Little will serve an additional 60 days of prison under the lawful sentence imposed at resentencing.

So long as credit is given for time already served, the Double Jeopardy Clause does not bar the imposition of an increased punishment at resentencing where a defendant does not have a legitimate expectation of finality in the sentence originally imposed. *See United States v. Fogel*, 829 F.2d 77, 87 (D.C. Cir. 1987) ("If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited by the double jeopardy clause. If, however, there is some circumstance which undermines the legitimacy of that expectation, then a court may permissibly increase the sentence."); *see also United States v. DiFrancesco*, 449 U.S. 117, 137 (1980) ("the Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase"). Here, Caplinger can have no legitimate expectation of finality in his split sentence because he challenged the legality of that sentence, and the appellate court has remanded for resentencing. *See Little*, No. 21-CR-315-RCL, ECF 69 at 7 ("Here, Little lacked a legitimate expectation of finality . . . because he received an illegal sentence and challenged it on direct appeal").[10]

---

*United States v. Mazzio*, No. 22-cr-214-RCL, is another case in which a January 6 defendant was sentenced to a split sentence of 60 days' incarceration and 36 months' probation for the commission of a single petty misdemeanor. At the time of resentencing, after remand from the D.C. Circuit, Mazzio had completed the term of imprisonment and approximately 14 months of probation. At the resentencing, the court imposed a probationary sentence of 46 months, crediting Mazzio, who had been fully compliant with the terms of his probation, with 14 months already spent on probation and with 20 months for the 60 days in prison. *United States v. Mazzio*, No. 22-cr-214-RCL, Minute Entry for Resentencing (Jan. 31, 2024). Thus, after accounting for 34 months of credit, Mazzio will serve an additional 12 months of probation under the lawful sentence imposed at resentencing.

[10] Moreover, the D.C. Circuit rejected the notion that double jeopardy forecloses resentencing in this case. Caplinger objected to the imposition of any further punishment on double jeopardy grounds and requested that the D.C. Circuit vacate his probationary term because he had already served the term of incarceration imposed as part of his split sentence. *See* Appellant's Renewed Motion to Vacate, *United States v. Caplinger*, No. 22-3057 (D.C. Cir. Dec. 11, 2023); *see also* Appellee's Opposition to Appellant's Renewed Motion to Vacate, *United States v. Caplinger*, No. 22-3057 (D.C. Cir. Dec. 21, 2023). Nevertheless, the D.C. Circuit vacated Caplinger's original sentence and remanded for resentencing.

Many courts have recognized that a more severe punishment can be imposed at resentencing even after service of the original unlawful sentence has begun. *See, e.g.*, *Little*, No. 21-CR-315-RCL, ECF 69 at 10 ("An increased punishment is permissible even if the defendant has begun serving the original, illegal sentence, although any punishment already incurred must be credited against the increased punishment."); *Hayes*, 249 F.2d at 517-18 ("a sentence which does not conform with the applicable statute [because it is below the statutory minimum] may be corrected though defendant . . . has begun to serve it"); *Lominac*, 144 F.3d at 317-18 (remanding to district court for resentencing after vacating supervised release component of split sentence, noting that term of incarceration could be adjusted upwards even after defendant completed originally imposed term of incarceration), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000); *United States v. Versaglio*, 85 F.3d 943, 949 (2d Cir. 1996) (remanding to district court to consider imposition of increased fine after invalidating incarceration component of split sentence even after defendant already paid originally imposed fine in full); *United States v. Holmes*, 822 F.2d 481, 498 (5th Cir. 1987) ("Correction of a sentence can occur even if service of the sentence has begun, even if the correct sentence may be more onerous to the defendant than the original.") (citation omitted); *Christopher v. United States*, 415 A.2d 803 (D.C. 1980) (affirming sentencing court's sua sponte correction of illegal split sentence by eliminating probation component and imposing term of incarceration greater than that originally imposed where defendant had already begun serving sentence).

## V.     Analysis of § 3553(a) Factors for Resentencing

The overall purpose of the resentencing inquiry, like an original sentencing, is to ensure that the sentence is "sufficient, but not greater than necessary, to fulfill the purposes of [18 U.S.C] § 3553(a)." *United States v. Palmer*, 89-cr-36-RCL, 2023 WL 2265255, at *4 (D.D.C. Feb. 28,

2023) (cited authorities omitted). The Supreme Court in *Pepper v. United States*, 562 U.S. 476, 481 (2011), held that when a "sentence has been set aside on appeal, a district court at resentencing *may* consider evidence of the defendant's post-sentencing rehabilitation" (emphasis added). Courts have interpreted the principle articulated in *Pepper* to permit district courts to consider post-sentencing conduct evidence that "does not always benefit the defendant" and "evidence of bad acts occurring after the defendant was originally sentenced." *United States v. Lawrence*, No. 03-cr-92-CKK, 2020 WL 5253890, at *7 (D.D.C. Sept. 3, 2020), *aff'd*, 1 F.4th 40 (D.C. Cir. 2021) (quoted authorities omitted).

*Caplinger's Conduct Post-Sentencing*

Regarding Caplinger's conduct pre-plea agreement, the government incorporates by reference, its analysis of the § 3553(a) factors set forth in its original sentencing memo (ECF No. 46).

According to Caplinger's probation officer, Caplinger was almost wholly compliant with the conditions of probation in the time between his release from prison and the vacating of his sentence. Caplinger has competed his G.E.D., regularly attends therapy, maintains a stable residence, reports to probation when required, and has not had any criminal activity. Probation indicated the only compliance issue is Caplinger's continued use of marijuana.

Caplinger continues to be a prolific poster on social media and X (formerly known as Twitter). Some of these posts suggest that he exhibits a lack of remorse regarding his conduct on, and the broader events of, January 6, 2021. For example, on March 9, 2024, Caplinger retweeted a video of rioters on the floor of the House chamber that was captioned, "J6 was fkn hilarious and I will never pretend that it wasn't."



*Government's Requested Sentence*

As stated above, the Court should resentence Caplinger to a lawful sentence that effectuates the intent and effect of the original sentence imposed, while simultaneously accounting for his post-plea conduct. Originally, this Court sentenced Caplinger to a term of 35 days of incarceration and two years of probation. In doing so, the Court understood and appreciated the need for punishment and deterrence, consistent with §3553(a). Having the defendant incarcerated for a short term, followed by supervision, fulfilled those goals.

Now, the Government recommends the Court consider sentencing Caplinger to a term of probation that will, including any credit for prior probation and incarceration, comport with the Court's original intention of Caplinger serving two years of probation. Such a sentence would be "sufficient, but not greater than necessary to comply with the purposes [of the sentencing statute]," 18 U.S.C. § 3553(a), and would effectuate the intent and effect of the original sentence.

While the government is not seeking an additional term of incarceration, in a case like this, a sentence of probation is important. First, despite Caplinger's status as a probationer, he continued

to express beliefs and assert facts contrary to those he pled and acknowledged. At the very least, these public statements undercut the spirit of his actions throughout the plea process. Second, despite his public comments, Caplinger made some notable personal progress during his initial term of probation. The rehabilitative effect of probation should be allowed to continue for a longer, appropriate term of supervision. Finally, it would be to the benefit of both Caplinger and the community to have him remain on probation during the current Presidential election year. The context of the current election could give rise to circumstances like the ones that preceded his criminal conduct. Through a term of probation, the Court would protect Caplinger and the community against any such impulses.

## VI.   Conclusion

For the reasons set forth above, the government respectfully requests that the Court resentence Caplinger in accordance with the statutory sentencing factors and impose a term of probation that will, including any credit for prior probation and incarceration, comport with the Court's original intention of Caplinger serving two years of probation.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:      /s/ Matthew Beckwith_____
         MATTHEW BECKWITH
         DC Bar No: 90014452
         Assistant United States Attorney
         601 D Street, N.W.
         Washington, D.C. 20004
         (202) 252-7109
         Matthew.Beckwith@usdoj.gov

By:      /s/ Michael M. Gordon_____
         Michael M. Gordon

Assistant United States Attorney
Detailee to the
United States Attorney's Office
for the District of Columbia from the
United States Attorney's Office
for the Middle District of Florida
Telephone No. (813) 274-6370
Michael.Gordon3@usdoj.gov